CANTON COTTON WAREHOUSE COMPANY *v.* SIMON A. POOL.

1. MASTER AND SERVANT. *Independent tort.*

   The master is not responsible for the independent torts of his servants, not done in his business, but wholly on their own account.

2. SAME. *Use of master's machinery.*

   The use by servants of their master's machinery in the perpetration of an independent tort, having no relation to their employment, does not render the master liable therefor.

3. SAME. *Practical joke.*

   The master is not responsible for the results of a practical joke played by his servants on a stranger, not in the performance of their duties, but wholly beyond the scope of their employment.

FROM the circuit court of Madison county.

HON. ROBERT POWELL, Judge.

Pool, the appellee, was the plaintiff, and the Canton Cotton Warehouse Co., the appellant, was the defendant in the court below.   The action was for personal injuries received by the plaintiff, resulting from jumping out of a house because of his having been frightened by the defendant's servants.   The defendant was engaged in manufacturing ice.   Its plant was being operated at night, lighted with electricity.   The plaintiff, a country boy, with two companions, also rural youths, were wandering over the town of Canton, seeing the sights, when they met an old acquaintance, then employed by defendant as night watchman.   This acquaintance, after relating some marvelous effects that had been wrought some time before by the explosion of a boiler in the ice plant, invited his rural friends to go through the plant for the purpose of seeing the operation of ice making.   The invitation was accepted.   The plaintiff's subsequent experiences were related by him on the witness stand as follows:

"On the night of February 4, Jim Vinson and Kernop and myself were walking around the town.   It was suggested by Mr. Vinson that we go down to the depot; that Mr. Alex. Kaiser was keeping a little eating stand there, and Jim being well acquainted with him, he said he would go down there and talk with him for awhile.   We went down there, and some of us were talking with him and some of us were standing on the outside, and we met up with Mr. W. H. Parker.   He is the night watchman for the Canton Cotton Warehouse Company, and we talked with him for awhile, and he sorter deviled us about going across the railroad.   He said we had better mind how we would go across there.   He looked at his watch a time or two, and said it was about time he had to go and make his rounds; that he had to punch his clocks.   He was the night watchman.   He said, 'If you boys are not going across the railroad, you had just as well walk around with me,' and he

punched a clock or two there in the cotton yard, and he went up there back of the premises, in the alley, and punched about two clocks in there, I think.   He said, 'If you all want to, you can go up to the icehouse and look at the machinery,' and so we went up there with him, and he punched a clock there at the west side.   It is where the door there leads into the far room.   The door there opens on the ground.   He punched the clock and opened the door and told us to walk in, and, as we walked in, there was a young Mr. Rucker there reading, and there was a negro man in the fireroom with him.   As we walked into the engineroom there, Mr. Campbell was there, working on some machinery.   It was Will Campbell, and we walked around there and looked at the machinery.   There was Sims Bilbo and Jim Fitchett.   That was all the white boys that was in there.   We walked in there, and about the time we got ready to go I was about ten feet from the door leading out from the east side, and Mr. Vinson was about the middle of the building, and Mr. Kernop was between me and Vinson, and all at once the lights went out and it was dark as it could be.   It seemed like they had thrown down 10,000 pounds on an iron roof, and the steam was. escaping there like it was going all to pieces.   I shot out of the door.   I knew that it had blown up before that.   I thought I was risking my life and I thought that I would be killed.   I think, gentlemen of the jury, that any man would have run if he had been in my place.   I thought that half of one of those engines was going to slam through me, and I fell out of the door.   When I plunged out there I fell on my head and struck a rail—that is, an iron rail struck me right there.   I don't know how I hit, but my jaws went up that way.   There is a place there that the doctor told me would get all right, but it has never done it.   He looked at it the other day and said it was out of shape yet. It knocked out this tooth and this tooth up here, and this tooth back in here was shattered up.   They were all loosened up, and this jaw was jarred in there, and I could not straighten

my head for about two weeks. I cut my tongue on the top there, about middle ways, nearly to the edge, and I could not use my tongue and I had it sewed up. My jaw was hurt so I could not get it open any further than this, and my tongue was hanging out bleeding, and I could not do anything with it until Dr. Coleman sewed it up. It was a pretty bad place. I felt that I had bit my tongue off. My teeth were all knocked out and I was in bad shape. I have been slightly ruptured in my life, but since then I have been bothered time and again.''

. The evidence showed that the defendant's employes were playing a practical joke upon the plaintiff, and made use of its appliances to alarm him.

The verdict and judgment in the court below was in plaintiff's favor for $1,000, and defendant appealed to the supreme court.

*W. H. Powell*, for appellant.

If the appellee suffered damage by the acts of appellant's servants, appellant is not liable, because such servants were acting at the time beyond the scops of their authority and out of the line of their duty, and had quit for the moment their master's business. *New Orleans, etc., R. R. Co.* v. *Harrison*, 48 Miss., 112; *Louisville, etc., Ry. Co.* v. *Douglass*, 69 Miss., 723. The very sound doctrine announced in *Richberger* v. *American Express Co.*, 73 Miss., 161, is not in conflict with our contention, and is not authority against us upon the facts of this case. '' The test of the master's responsibility is not the motive of the servant, but whether that which he did was something that his employment contemplated and something which, if he should do it lawfully, he might do in the employer's name. If the servant, wholly for a purpose of his own, disregarding the object for which he is employed, and not intending by his act to execute it, does an injury to another not within the scope of his employment, the master is not liable.'' Cooley on Torts (2d ed.), 629. The proof shows to a

certainty that the employes were not acting within the scope of their employment or about their master's business, or in the line of their duty to appellant. They were inferior and subordinate employes, with specific instructions to follow, and one of these instructions was not to play tricks on any one. 14 Am. & Eng. Enc. L. (1st ed.), 809, sec. 5; *Ib.*, 818; *Chicago, etc.*, *R. R. Co.* v. *Epperson*, 26 E. B. Smith (Ill. App.), 79; *Rounds* v. *Delaware, etc., Ry. Co.*, 64 N. Y., 129; 16 Am. & Eng. Enc. L. (1st ed.), 428, and note 1, on pp. 429, 430; *Meyer* v. *King*, 72 Miss., 1; *Capital City Oil Works* v. *Black*, 70 Miss., 8; *Sneed* v. *Moorehead*, 70 Miss., 690; 14 Am. & Eng. Enc. L. (1st ed.), 861.

*A. K. Foot*, on same side.

Is a man responsible for a wilful tortious act of the servant, committed during the existence of the servant's employment, but not in the furtherance of the master's business, not in the scope of the servant's employment, but for a purpose entirely foreign? Mechem on Agency, secs. 740, 741; Wood on Master and Servant, sec. 299 *et seq.*; Shearman & Redf. on Neg., sec. 150. Does the fact that the injury was caused by the wrongful manipulation of the machinery of the defendant by the employe, when that employe was employed to make ice with it, and he uses it for another purpose of his own, place any liability on the defendant? The cases are all uniform in holding that he is not, except in cases where the defendant owes the plaintiff a special duty, as in the case of a common carrier to its passengers. Poole, at the most, was a mere licensee, and the defendant owed him no special duty. *Davis* v. *Houghtelin* (Neb.), 14 L. R. A., 737; *McCoy* v. *McKowen*, 26 Miss., 487; *Stephenson* v. *Southern Pacific Co.* (Cal.), 27 Am. St. Rep., 223; *Howe* v. *Newmarch* (Mass.), 12 Allen, 49; *Richmond Turnpike Co.* v. *Vanderbilt*, 1 Hill (N. Y.), 480; *Manns* v. *Crickett*, 1 East., 106; *Mott* v. *Consumers' Ice Co.*, 73 N. Y., 547; *Farber* v. *Missouri Pacific Ry. Co.*, 32 Mo. App., 378.

The cases are uniform in holding that the gist of the master's liability is "whether the act that caused the injury was done within the scope of the servant's authority, with the furtherance of the master's interests in view," not whether it was malicious or wilful, or accomplished by the wrongful use of the master's machinery or tools.

*Mayes & Harris,* on same side.

In order that the doctrine *respondeat superior* may apply, it is elementary that three things are necessary:

1. The injury complained of must have been inflicted by an employe of the defendant.

2. The employe in inflicting such injury must have been acting within the apparent scope, at least, of his employment.

3. Even where the employe who inflicts the injury is acting within the apparent scope of his employment, his act must be done in furtherance of his master's business and for the accomplishment of the purpose for which he is employed. *International, etc., Co.* v. *Anderson,* 82 Texas, 516; *Hudson* v. *Missouri, etc., Co.,* 16 Kansas, 470; *Eckert* v. *St. Louis, etc., Co.,* 2 Mo. App., 36; *Little Miami, etc., Co.* v. *Wetmore,* 19 Ohio State, 110; *Lakin* v. *Oregon, etc., Co.,* 15 Oregon, 220; *Wyllie* v. *Palmer,* 137 N. Y., 248; *Snyder* v. *Hannibal, etc., Co.,* 60 Mo., 413; *Rudgeair* v. *Reading Co.,* 180 Pa., 333; *Mott* v. *Ice Co.,* 73 N. Y., 543. This rule has been fully recognized by this court and applied. *Railway Company* v. *Douglass,* 69 Miss., 723; *Butler* v. *Oxford,* 69 Miss., 618.

The rule is in no way in conflict with that line of authority which holds a railway company responsible for practical jokes of a mischievous and injurious nature committed upon its passengers by its employes. In such cases the doctrine is that the company is responsible; and of those cases 81 Ind., 19, is a type; but the court will see, of course, that the special instance arises out of the contract relation. The contract is that the company shall transport its passengers and transport them

safely; and the contract to transport safely includes the obligation to protect from practical jokes by its employes, even though they be acting not within the scope of their employment, just as it also includes the contract to protect against assaults, batteries and similar misconducts on the part of employes and fellow passengers. That line of authorities has nothing to do with this case. The distinction is drawn in the case in 81 Ind., 19, itself. In the case at bar appellee occupied no contract relation to the ice company at all. He was not in the plant by its invitation. Technically speaking, he was a trespasser. That some of the employes played a practical joke on him is a thing for which the company is not responsible. *Railway Company* v. *Cooper*, 88 Texas, 607.

*Chrisman & Howell*, for appellee.

We will not dwell upon the injury inflicted by this practical joke on the appellee. Let it suffice to say that the court on examination of this record will be surprised at the moderation of the jury is estimating the damages, justified as they were by the instructions of the court and the evidence in the case.

The evidence tends to prove that these practical jokes, perpetrated with the machinery of the factory while visitors were watching the manufacture of ice, were of frequent occurrence. That this fact was known to the superintendent and officers of the company, who, except to administer a mild rebuke to the employes, did nothing to stop it. Not a man was ever discharged before or after this occurrence for the devilment. It shows that the engineer, Will Campbell, was probably the chief organizer of the jokes, and was in fact the brother of W. H. Campbell, the superintendent. The evidence also tends to show that the engineer in charge of the machinery, and Rucker, the salesman, and the negro who manipulated the ice puller, operated by compressed air, all conspired to produce the result. This is an inference, however, based on the fact that both appliances and instrumentalities were used in creating the racket and consternation.

A short time after his injury, smarting under the ridicule of the public, plaintiff wrote a letter to the president of the company asking that officer to so far take his part as to dismiss the servants that had so grievously injured him; but no notice was taken of his letter.   After this contemptuous treatment suit was brought.   Among the significant facts which the trial disclosed was the absence of every servant of the company on duty the night of the trespass from the witness stand, and the unavailing efforts of the plaintiff to procure their attendance. They were not discharged from the service of the company for the outrage on the plaintiff, and one of them, at least, hid out from the writ in the hands of the officer to avoid giving his testimony, with the connivance of defendant.

That a man who has been waylaid and deliberately frightened as appellee was in this case, is not responsible for errors of judgment in an effort to escape is elementary learning.   Beach on Contrib. Neg., marg. p. 14.

The master who puts the servant in a place of trust and responsibility, or commits to him the management of his business or care of his property, is justly held responsible when the servant, through lack of judgment or discretion, or from infirmity of temper, or under the influence of passion aroused by the circumstances and the occasion, goes beyond the strict line of his duty and authority and inflicts an unjustifiable injury upon another.   *Richberger* v. *Express Co.*, 73 Miss., 161; *Pullman Palace Car Co.* v. *Lawrence*, 74 Miss., 782.

Defendant's ice factory was a public place under its exclusive management and control, to which the plaintiff, in common with the public, had license to enter, either on business or to examine the same, and therefore defendant owed to plaintiff a duty to keep his premises free from, or give him warning of, such of his employes as he knew were vicious, mischievous and dangerous.   Defendant ratified the conduct of its servants.

That the rule adopted by the court below may in some case work hardship is probably true, but the rule in *McManus* v.

*Crickett* much more frequently, for the latter abolishes every safeguard against the despotism and malice of irresponsible employes with which the great body of the people are brought in contact in the everyday affairs of life. Employers have a remedy in their own hands to avoid the liability for damages from the acts of irresponsible and dangerous employes. They have only to exercise care in selecting their employes and watchfulness over their conduct. If they are released from this duty, the consequences will be far reaching. It is curious to note that, notwithstanding the acknowledged authority of the leading case for years before it was overruled, there were constant departures from it, refinements and evasions, which showed the revolt of the judicial mind.

Argued orally by *Edward Mayes*, for appellant, and *J. B. Chrisman*, for appellee.

WHITFIELD, C. J., delivered the opinion of the court.

The act done here was not the act of the master. It was not done in the master's business, but was an enterprise wholly disconnected therefrom, done exclusively on their own account by the employes, for the highly reprehensible purpose of playing a practical joke. It very clearly appears that though the implements used were those of the company, used in certain ways in the making of ice, they were in this act not used as they would be in the making of ice. The slamming of the coal scoop on the iron stairs, and the shutting off of steam, usually self-regulating by the automatic air pump, the turning out of the electric lights, and the yelling of the voices were not modes of making ice, but were a use solely for a mischievous purpose of those engaged in it, and in no sense an act done in the master's business. The case is wholly different from *Richberger's case*, 73 Miss., 161, s. c. 18 South., 922, s. c. 31 L. R. A., 390. There Richberger was in the express company's office, transacting express business. The agent was refunding him an

overcharge, and taking a receipt therefor, and "immediately" upon the signing of the receipt, so that there could be no logical separation of what he did in the assault from the transaction of the express business, committed the assault. The appellee here was engaged in no business with the appellant, buying no ice. No employe of appellant was engaged in transacting any business of his master's with appellee. The acts done in the perpetration of this practical joke were wholly out of the line of their employment. That the appellee has no cause of action against appellant is made plain by the authorities collected in the exhaustive note to *Ritchie* v. *Waller* (Conn.), 27 L. R. A., 161, s.c. 28 Atl., 29, and by *Railroad Co.* v. *Latham*, 72 Miss., 32, s.c. 16 South., 757; and see specially *Rounds* v. *Railroad Co.*, 64 N. Y., 136; *Bowler* v. *O' Connell* (Mass.), 38 N. E., 498, s.c. 27 L. R. A., 173; *Smith* v. *Railroad Co.*, 78 Hun, 524, s.c. 29 N. Y. Sup., 540. In Bowler's case, the court say: "An act done by a servant while engaged in his master's work, but not done as a means or for the purpose of performing that work, is not the master's act." This is said to be too broad a statement of the law, at page 164, 27 L. R. A., in the note referred to, because it does not provide for the "misuse of a dangerous machine, as in *Railway Co.* v. *Scoville*, 10 C. C. A., 479, s.c. 62 Fed., 730, s.c. 27 L. R. A., 179," a case relied on by appellant, affirmed by a divided court. But manifestly this is not a case like cases where the question is as to the custody of dangerous implements, as steam engines, dynamite, torpedoes, etc. The ordinary appliances in use in an ice factory cannot be so classed, certainly not a coal scoop and electric lights. The true test is very clearly stated in *Smith's case*, 78 Hun, 524, s.c. 29 N. Y. Sup., 540, a torpedo case. Says the court: "If by doing what he did he went outside of his employment in order to effect a purpose of his own, in exploding the torpedoes for his own amusement and not for the purpose of signaling the train, then the company would not be liable."

The inquiry is not whether the act in question in any case was done, so far as time is concerned, while the servant is engaged in the master's business, nor as to the mode or manner of doing it; whether in doing the act he uses the appliances of the master, but whether, from the nature of the act itself as actually done, it was an act done in the master's business or wholly disconnected therefrom by the servant, not as servant, but as an individual on his own account.    In the light of these principles it is clear there was nothing to go to the jury, and the peremptory charge asked by the defendant should have been given.

*Reversed and remanded.*