421 So.2d 1031 (1982)
Mary HENDRICKS, et al.
v.
Dykes L. JAMES, et al.
No. 53787.
Supreme Court of Mississippi.
November 3, 1982.
Rehearing Denied December 1, 1982.
*1032 Richard E. Stratton, III, Brookhaven, for appellants.
Donald B. Patterson, Brookhaven, for appellees.
En Banc.
HAWKINS, Justice, for the Court:
Mary Hendricks, Stanley H. Hendricks, and Mrs. Etta McInnis Lambert, the heirs-at-law of Terry Hendricks, have appealed from a final decree of the Chancery Court of Lincoln County dismissing their bill of complaint to set aside a deed, bill of sale, and transfers made by Mr. Hendricks during his lifetime to the defendants, Dykes L. James and Glynn R. James, nephews of his pre-deceased wife. The defendants have cross-appealed the ruling of the chancellor that a fiduciary relationship existed between them and Mr. Hendricks.
The issues we address on this appeal are the sufficiency of the evidence to support the findings of the chancellor:
(1) that a fiduciary relationship existed between these parties;
(2) that Mr. Hendricks possessed sufficient mental capacity to engage in these transactions; and
(3) that the presumption of invalidity arising from the transactions by virtue of the fiduciary relationship was rebutted.
We affirm on cross-appeal. We reverse and render on direct appeal on the third issue above stated.

SUMMARY
Terry Hendricks and his wife, Maude (or Maudell) James Hendricks, married sometime in the early 1920s. No children were born to their marriage. They apparently lived their entire married lives in Lincoln County, northwest of Brookhaven. Mrs. Hendricks died intestate June 28, 1979. Mr. Hendricks died intestate July 29, 1979, at the age of 76.
On July 2, 1979, there was on deposit in the Brookhaven Bank and Trust Company a joint checking account in the names of Mr. or Mrs. Hendricks. On July 6, 1979, Mr. Hendricks had $34,993 on deposit in this account (No. XX-XXXX-X). He also had two certificates of deposit in the amount of $1,000 each.
The Hendricks also had a safety deposit box with this bank, which had been used over the years by Mr. Hendricks. The contents of this box are not in the record.
The Hendricks also owned four certificates of deposit in the State Bank and Trust Company of Brookhaven in the names of "Mr. or Mrs. Terry Hendricks, Either or the Survivor," all dated October 17, 1974, and in the amount of $500.00 each.
Their home was situated on approximately 123 acres of land. Apparently the deed to this realty was in the name of Mr. Hendricks. Forty acres of this land was in virgin timber.
Mr. Hendricks also owned a mineral interest in realty in the south half of the northeast quarter (S 1/2 of NE 1/4) in Section 13, Township 9 North, Range 8 East in Copiah County.
At his wife's death, Mr. Hendricks also owned personalty consisting of an old automobile, the household furniture and appliances, and personal belongings. Mr. Hendricks' sole heirs-at-law were Mary Hendricks, a sister, Stanley H. Hendricks, the son of a pre-deceased brother, and Etta McInnis Lambert, the daughter of a pre-deceased *1033 sister. Stanley lived in New Orleans; Mrs. Lambert and Miss Hendricks lived in Lee County, Mississippi.
The record does not reveal the names of all the blood relatives of Mrs. Hendricks (or her heirs-at-law had she survived her husband). She did have a half-brother, Floyd Lee Moak; a half-sister (not named in the record), who is the mother of Mrs. Jewell Dunn; and two nephews, Dykes L. James and Glynn R. James, the sons of a pre-deceased brother, J. Hugh James (the record is not clear he was a whole or half-brother). All these parties were residents of Lincoln County.
Mr. Hendricks was chronically ill, suffering from the disease Wegener's Granulomatosis and degenerative arthritis. He was hospitalized in May, 1979. He was again hospitalized from July 8 until July 20, and was re-admitted to the hospital on July 28, where he died on July 29, 1979. All these hospitalizations were in the local hospital in Brookhaven.
Mrs. Hendricks died on a Thursday, and was buried the next day. On the Monday following, July 2, Mr. Hendricks, accompanied by Dykes James, went to the Brookhaven Bank and Trust Company. At Mr. Hendricks' request, a bank employee struck the name of Mrs. Hendricks off the checking account, and changed the name to "Terry M. Hendricks or Dykes James or Glynn James." Two signature cards as to this account were signed. One was signed by Mr. Hendricks and Dykes James. The other was signed by Mr. Hendricks, Dykes James, and Glynn James. Both are dated July 2, 1979, and provide that the funds in the account shall be joint property with the right of survivorship and not as tenants in common. The card that bears Glynn James' signature was taken from the bank by Dykes for Glynn to sign.
The certificates of deposit were also changed to the names of Mr. Hendricks, Dykes James, or Glynn James. The safe deposit box card was changed by adding the names of Dykes James and Glynn James as Lessees.
Also on July 2, Mr. Hendricks and Dykes James went to the State Bank and Trust Company, and at Mr. Hendricks' request the certificates of deposit with that bank were changed to the names of "Mr. Terry Hendricks or Dykes James or Glynn James, Either or the Survivor."
On July 18, Mr. Hendricks executed a general warranty deed to all of his realty to Dykes L. James and Glynn R. James. This deed was signed in the hospital. The deed was read to him in the hospital room by the chancery clerk, who took the acknowledgment. Dykes James and his wife Helen, and Juanita James, the wife of Glynn, were also present in the room.[1] This deed was filed for record on August 20.
On July 23, Mr. Hendricks executed a bill of sale to Dykes L. James and Glynn R. James to all of his personalty, namely: "all personal property of every kind and character and wheresoever situated, including but not limited to household furnishing and furniture." This document was executed in Dykes James' pickup truck; James brought a deputy chancery clerk out to the truck to take the acknowledgment.
On this same day, the two certificates of deposit with the Brookhaven Bank and Trust Company were also cashed and placed on deposit in the checking account.
As a result of the above transactions Mr. Hendricks left no estate.
Letters of administration were granted to Mary Hendricks by the Chancery Court of Lincoln County on August 6, 1979. On August 30, Miss Hendricks individually and as administratrix, and Stanley Hendricks and Mrs. Lambert filed a bill of complaint in the chancery court of that county against Dykes L. James and Glynn R. James to set aside the deed to them from Mr. Hendricks, as well as to return all personal property and the sum of $46,640.96 plus interest. The bill also prayed for discovery of Mr. Hendricks' assets.
*1034 The factual allegations supporting the bill charged a fiduciary relationship between Mr. Hendricks and the defendants, a weakness of body and mind, as well as mental incapacity to execute the instruments, fraud and undue influence in procuring the execution of the instruments and the monetary assets, and gross inadequacy of consideration. The defendants denied all these charges.
Following trial the chancellor found a fiduciary relation existed between Mr. Hendricks and the defendants beginning on July 2. However, as to Mr. Hendricks, the chancellor ruled that "it was his desire all along for these boys to have the property he had out there. There's been no contradiction of that." He found Mr. Hendricks to be a frugal man who was trying to attend to these matters without court expenses, and that the chancery clerk's testimony showed that when Mr. Hendricks signed the deed, Mr. Hendricks knew what he intended to do, and the same was true when the deputy clerk took the acknowledgment to the bill of sale. Finally, the chancellor found that the burden imposed upon the defendants by virtue of their confidential and fiduciary relationship had been met, and denied the relief prayed for. A decree was rendered accordingly, from which the complainants have appealed.
The assignments of error on direct appeal, as stated above, raise two issues: (a) mental capacity, and (b) sufficiency of the evidence adduced to rebut the presumption of invalidity of these transactions arising from the fiduciary relationship between the parties.

TRIAL EVIDENCE
The complainants' first witness was Mr. Emmette P. Allen, an attorney in Brookhaven. Mr. Allen had rendered legal services occasionally over the years for the James family, including Dykes. He did not recall ever doing any legal work for Mr. Hendricks.
From his recollection and the records in his office, Mr. Allen testified that on July 18, at Dykes James' request, he prepared the warranty deed and a mineral deed based on legal descriptions furnished him by Dykes James.[2] On July 23, he prepared the bill of sale. Dykes James paid him by two checks: $50.00 on July 18, and $10.00 on July 23.[3] Mr. Hendricks did not accompany Dykes to Mr. Allen's office, and Mr. Allen had no contact with Mr. Hendricks relative to the preparation or execution of any of these instruments.
Mrs. Jewell Dunn, the niece of Mrs. Hendricks, recalled an instance when she visited Mr. Hendricks prior to his wife's death and during his hospitalization. He complained that the medicine being given him by the nurses was not easing his pain. Mrs. Hendricks telephoned the doctor, and then gave him some medicine from her purse.
On the Sunday afternoon following Mrs. Hendricks' death, Mrs. Dunn took her mother to Mr. Hendricks' home. He remained reclining on a cot their entire visit, and Mrs. Dunn was of the opinion he was too weak to get up.
She further testified that Mr. Hendricks told her mother, "he wanted his stuff divided equally. That he loved his nephews and nieces, and he wanted everything divided equal ..." Mrs. Dunn said Mr. Hendricks made no distinction between blood or marriage nephews and nieces, and she did not know how many he had. Mr. Hendricks did not mention a sister in this statement.
Mrs. Dunn's husband was also hospitalized July 11, and died July 18. She was asked if she visited her Uncle Terry in the hospital, and replied:
Not too often, but I went one time to see Uncle Terry, and Juanita James was in there, and she come to the door and put her finger on her mouth, and I come out, because she didn't act like she wanted me to come in.
Robert L. Calhoun, the deputy chancery clerk, testified that he met Mr. Hendricks *1035 for the first time on July 23 in a pickup truck, "Over at the Courthouse. Over at Eva Harris." He had been asked by Dykes James to go out to the pickup and take Mr. Hendricks' signature. Dykes was in the pickup with him. He said Mr. Hendricks told him who he was, and Mr. Calhoun asked him if he knew what he was doing, and Mr. Hendricks replied he did. Mr. Calhoun then asked him, "You do know what this is?" Mr. Hendricks replied, "I do." Mr. Hendricks signed the bill of sale in Mr. Calhoun's presence.
Floyd Lee Moak, 82 years of age at the time of trial and Mrs. Hendricks' half-brother, had known Mr. Hendricks since he boarded at their home when he was in high school. The Hendricks lived a quarter of a mile from him. He stated that he knew Mr. Hendricks as well as anybody could know him, and for the six months prior to Mrs. Hendricks' death he visited them every two or three weeks, and "sometime closer." He testified they were on welfare "and the stamps." He had been in their home when the "welfare woman" (who, according to him, was out there every week), gave them shots, took their blood pressure, and had Mr. Hendricks breathe through a tube in his mouth. The extent of Mr. Hendricks' disability prior to his wife's death is not clear from Moak's testimony, but he testified that until Mrs. Hendricks died, he attended to their wants and needs. He recalled bringing Mr. Hendricks home from the hospital one time. Prior to Mrs. Hendricks' death, Moak stated that when he visited, Mr. Hendricks would "lay" on a little three quarter bed, and "he wouldn't say nearly a word unless you said something first, and then he would talk a little." After Mrs. Hendricks died, according to Moak, "Dykes and Glynn James and Juanita James taken over." At one time he went over to the Hendricks' house, and Mrs. Juanita James and another lady were out in the lot setting out and watering tomatoes, and they were "hollering at me." Mr. Hendricks was also out at the lot on his hands and knees. He was of the opinion that Mr. Hendricks at the time was not "at hisself."
Moak had loaned the Hendricks a cedar bedroom suite, and after Mrs. Hendricks died he told Mr. Hendricks that he wanted it back. According to Moak, when he went to get the suite on July 27, Mrs. Juanita James had taken the mattress off the bed and would not let him have any of his furniture. He also testified that part of the furniture in the house was missing on that date.
Moak further testified that he had seen Mrs. Hendricks give her husband drugs, and that for the last several months of his life Mr. Hendricks was not capable of taking care of himself, "because he was on dope." Mrs. Hendricks had complained to Moak that she had to keep it hidden from him, or he would take it all and it would kill him.
Moak stated that Mr. Hendricks was the sort of person who kept his business to himself, and that prior to Mrs. Hendricks' death he never saw Dykes or Glynn James or their wives at the Hendricks home, except on a single occasion a number of years previous.
Joseph C. Hillman, Jr., M.D., first began seeing Mr. Hendricks as a patient in January, 1976. Both Mr. and Mrs. Hendricks were his patients, and he saw Mr. Hendricks four or five times yearly. When Mr. Hendricks was having trouble, he saw him every two or three weeks, one or two times making a house call. "I saw him regularly," he stated. Dr. Hillman testified that he saw Mr. Hendricks on July 5:
He was there for his general complaints of shortness of breath and weakness, which were due to his severe lung disease, Wegner's Granulomatocis. This is a condition he had had for many years and was gradually deteriorating his lungs and caused him not to have adequate oxygen to his brain, and he was at that time, also, suffering from very severe depression. His depression was significant to the point I was really concerned about his well being. He was suicidal. In his discussions with me in the office. He didn't want to live. His wife had died approximately one month earlier, and he had absolutely no desire to continue living.
*1036 Dr. Hillman then stated that if a person lacks sufficient oxygen supply to his brain he would not be able to think clearly. He was of the opinion that, on July 5, Mr. Hendricks was, "definitely not of sound mind. He was in an attitude of self-destruction. His mental capacity was not adequate to handle himself."
He stated that Mr. Hendricks got much worse following Mrs. Hendricks' death, and he wanted to put Mr. Hendricks in the hospital July 5. Dr. Hillman was then asked about the two instruments dated July 18 and July 23, and as to Mr. Hendricks' ability to know, understand, and appreciate their significance. He replied, "There's no way Mr. Hendricks could have been in his right mind and be knowledgeable or even concerned about what he was doing."
Upon cross-examination the doctor was shown a check to "Dr. Joe Hillman" written and signed by Mr. Hendricks, dated July 24, in the amount of $265.09, with the notation in the lower left corner "one office call and hospital." This appears to have been written by a person quite shaky for some reason or another. The doctor was of the opinion that Mr. Hendricks was capable of performing some simple act such as signing a check, particularly if he was told to do so.
The doctor also agreed that Mr. Hendricks made some improvement in the hospital, but he would not have discharged Mr. Hendricks except for the fact that Mr. Hendricks begged the doctor to let him go home. Dr. Hillman testified Mr. Hendricks had two major problems: his lung condition which had deteriorated, and a severe depression. On cross-examination, the doctor testified:
In severe depression, a person's mind does not work the way it normally works. The chain of thought is not fluid, because of the absence of chemicals that are necessary. I cannot sit here and truthfully say his chain of thought would be normal, and he would understand the consequences of what he did.
According to Dr. Hillman, on July 18, Mr. Hendricks, from a medical standpoint, was in no mental state to be making any type of major decisions, whether they were simple or not, if they in fact affected his estate. As to his condition on July 18 and July 23, the following question and answer appears:
Q. Just didn't know what he was doing?
A. That's right.
Dr. Hillman's testimony is borne out by the medical record of Mr. Hendricks. The admission report stated on July 8:
This 76 year old male presents in profound shortness of breath. He has severe chronic history of Wegener's granulomatosis and has been discharged by the pulmonary service at Baptist hospital on prednisone every other day with no other recommendations. They have stated his condition is beyond further improvement. The patient has been chronically debilitated for several years due to this severe lung condition. The patient has also recently lost his wife due to her heart disease and is in a very severe depression.
The report also noted nausea and diarrhea, and severe degenerative arthritis.
The discharge summary of July 20 stated that he had been given percodan (an addictive drug in the nature of morphine) for pain, sinequan and elavil (anti-depressant drugs), had been fed intravenously, and had been given other medications for his gaseous distention.
The final paragraph of this summary states;
At the time of discharge, the patient is ambulatory with assistance and it is felt that he will do better at home than in the hospital due to his severe depression. The patient has no family, but friends have assured me that they will look out for him and bring him to my office in four days following discharge for evaluation.
Hospital notes by nurses show him being admitted in a wheel chair, crying one night, calling on the nurse on another night and telling her he was dying, and asking the nurse to call the doctor.
The record reveals that Mr. Hendricks had previously undergone surgery for removal of a part of one lung.
*1037 The defendants' first witness was Mr. Carrol Calhoun, Chancery Clerk of Lincoln County. He had known Mr. Hendricks eighteen to twenty years, seeing him during that period of time, "every year or so." His opinion was that Mr. Hendricks was a very secure person, independent, needing no help, and able and capable of doing just about anything he wanted to.
He testified that Dykes James telephoned him on the morning of July 18 to take an acknowledgment. He left his office with his seal, and went to Mr. Hendricks' room in the hospital. Mr. Hendricks was sitting on the side of the bed, they talked for a few moments, Mr. Hendricks saying he wanted to get out that day or the next. Mr. Calhoun then testified that:
he had this deed, and he said he wanted to sign that deed and wanted me to acknowledge it, and, of course, realizing he was in the hospital, I felt compelled to read to Mr. Terry the entire wording that appeared on the deed, and when I concluded reading it, I asked him did he understand it. He said he did. I asked him was it his wishes to sign it. He said it was. He signed it. I acknowledged it right there, put the seal on it, and completed it.
Mr. Calhoun stated that Dykes James and his wife, and Glynn James and his wife were also present in the room. He observed what he presumed to be a check written by Mrs. Dykes James, who gave it to Mr. Hendricks in his presence.
Mr. Calhoun was of the opinion Mr. Hendricks, "... was able and capable of executing this instrument as he said he so desired."
Mr. Calhoun was asked if he did not go to the hospital at night, but replied it was during the day. Two witnesses testified in the trial that Mr. Calhoun had told them he went to the hospital at ten o'clock at night, but Mr. Calhoun on surrebuttal was quite positive in his testimony it was during the day that he was in Mr. Hendricks' room.
Mrs. Genevieve Brown, of the Brookhaven Bank and Trust Company, had known Mr. Hendricks at least 20 years. She was of the opinion that he was thrifty and handled his business well. She recalled that on July 2 Mr. Hendricks was sick, and as to Dykes James, "I believe he had to help him in."
According to Mrs. Brown, Mr. Hendricks wanted to put Dykes James' and Glynn James' names on his checking account, his safety deposit box, and certificates of deposit. She did not think there was any change in his mental capacity. He was weak and he was sick, according to her, but he knew what he was doing. She thought his mind was alert.
The bank records showed that Mr. Hendricks went into his safe deposit box on July 23, and that a deposit was made in his checking account of two five thousand dollar deposits and one for $255.00.
On cross-examination it was pointed out that in July, 1979, when Mr. Hendricks signed his last name, he left the "s" off his name.
Mrs. Jo Coghlan was employed by the State Bank and Trust Company. She recalled that one of the James (she was not positive which) brought Mr. Hendricks into the bank on or about July 2. Mr. Hendricks told her his wife had died a week or two before and he wanted to remove her name from the savings certificates and put his nephews' names on them.
She was of the opinion that Mr. Hendricks knew what he was doing, that she saw no difference in Mr. Hendricks' condition from the condition in which she had previously observed him.
Colon Womack and D.M. Davis, who lived two and four miles distance, respectively, from the Hendricks, and had known them for a number of years, were both of the opinion that Mr. Hendricks knew what he was doing following the death of his wife, although both agreed he was a sick man. Mr. Womack saw Mr. Hendricks one time at the hospital following Mrs. Hendricks' death, and Mr. Davis saw Mr. Hendricks at the latter's home on July 27. Mr. Davis was of the opinion that on that date Mr. Hendricks could handle "any average business."
*1038 Mrs. Helen James and her husband Dykes operated a dairy farm which kept them busy daily from four a.m. until seven a.m., and from three p.m. until six p.m. She and her husband and Mr. and Mrs. Hendricks visited occasionally. They lived six or seven miles apart. Mrs. James cut Mrs. Hendricks' hair when she needed a haircut.
Prior to Mrs. Hendricks' death, neither Mrs. James nor her husband had anything to do in the management or business affairs of the Hendricks.
She testified that on the Sunday night following the death of Mrs. Hendricks (July 1) Mr. Hendricks telephoned. She received the call, and Mr. Hendricks asked Mr. and Mrs. James to come to his house after they got through with the dairy, that he wanted to talk to them. Mr. Dykes James, Mrs. Helen James, and Mrs. Juanita James went together to Mr. Hendricks' house. She testified the following took place at Mr. Hendricks' home:
Q. Tell me what Terry Hendricks said to you or in your presence on that occasion?
A. Well, okay. we got there, and we just  okay, we asked how he felt, and how he had been doing, and he told us, and we talked, with the conversation  I cannot say word for word as to what we talked about. But a little later on, he said, "The reason I called you out here tonight was to talk to you about my business." He said, "The last time that I did business on Sunday, I promised the Lord that I would never do it again, but I don't feel like that I have long to live, and I would like to get my business straight before I die, and I believe the Lord will forgive me this time." Those were his words.
Q. At that point, did he state what business he had in mind?
A. He said, "I would like to put Dykes and Glynn on the checking account and the savings account and the certificates," and the land was mentioned, but he says, "I'll let you know when I'm ready to do this business transaction."
Q. Is that the sum and substance of the business conversation that took place, Helen?
A. Yes, sir.
Q. Can you tell me whether or not he made any statement as to when he desired to take care of the banking business?
A. No, sir, he says, "I'll call you and let you know."
According to Mrs. James, Mr. Hendricks telephoned her husband on the morning of July 2. On July 16, she and Dykes visited Mr. Hendricks at the hospital. He told Dykes where he could find the key to the trunk where his deeds to his land were located, and that he would like for Dykes to, ... "go by and get it, sometime maybe at his convenience."
On July 18, Mr. and Mrs. Dykes James returned to the hospital. Mrs. Juanita James was also present when they arrived. Mrs. Helen James shaved Mr. Hendricks. Mr. James told Mr. Hendricks they had gotten the deeds, and after Mr. Hendricks looked them over, "He instructed Dykes to take the deeds and have them transacted."
Dykes left and, after going to Mr. Allen's office and having the instruments prepared, later returned. According to Mrs. James, Mr. Hendricks, "... read the deeds, and he said, `This is right.'"[4]
Mr. Hendricks then told the James that he would take ten thousand dollars. "It was $5,000.00 apiece, and he said, `I think this is reasonable.'"[5]
*1039 Mrs. Helen James and Mrs. Juanita James each wrote a check for $5,000.00 on their own checking accounts, and gave them to Mr. Hendricks.
The chancery clerk arrived and read the deed to Mr. Hendricks, who told Mr. Calhoun this was what he wanted done. After Mr. Calhoun left, Mr. Hendricks told the James to put the two $5,000.00 checks in the safety deposit box.
Cross-examination elicited the following:
(1) Mrs. Helen James was not sure how Mrs. Juanita James was notified to go to Mr. Hendricks' home that Sunday night, but she and her husband went to the Glynn and Juanita James home and picked her up. Mr. and Mrs. Dykes James, and Mrs. Juanita James went together to Mr. Hendricks' home. They arrived around seven to seven-thirty that evening.
(2) She testified Mr. Hendricks gave them no reason why he wanted Dykes and Glynn James' names on his checking account.
(3) When Dykes and Helen went to Mr. Hendricks' home to get the deeds from the trunk, Mrs. Juanita James gave Dykes the key to the house.
(4) Mrs. Helen James did not know why the mineral deed was not signed, or any instructions from Mr. Hendricks about it.
(5) She testified Dykes took the two $5,000.00 checks and put them in the safety deposit box.
(6) The only reason she could give for Mr. Hendricks' action about the deed was as follows:
He didn't think he had long to live. He was trying to tend to his business before he died. That's a request he made of us, and that's what he wanted done.
Mrs. Juanita James testified that she had known Mr. and Mrs. Hendricks for 15 years, and she, her husband, and Mr. and Mrs. Dykes James checked on them a good bit. She did not say how frequently. She visited in Mr. Hendricks' home the evening following Mrs. Hendricks' funeral. On the Sunday evening following, Mr. Dykes James telephoned her, and Mr. and Mrs. Dykes James picked her up at her home and they went together to Mr. Hendricks' home. She thought they arrived before dark. Mr. Hendricks had not called her to come. Present were Mr. Hendricks, Mr. and Mrs. Dykes James, and Mrs. Juanita James.
Juanita James' testimony as to what transpired in Mr. Hendricks home that evening is as follows:
We went in and set down and just talked for a while, and then he said he wanted to talk business.
* * * * * *
And he said he did not like to do business on Sunday, but he felt like he didn't have long to live, and he thought the Lord would forgive him.
* * * * * *
He said he wanted to have Dykes' and Glynn's names put on his stuff at the bank.
* * * * * *
He said he wanted to have their name put on his stuff at the bank, and he wanted to have it fixed up where they would get his land.
* * * * * *
Nothing was said about transfer of money or personally.
Mrs. Juanita James carried Mr. Hendricks to the hospital July 8, where she visited him daily, and spent the night with him one night. One night when she checked on him he was crying.
She was present on the morning of July 18. Only she, Mr. and Mrs. Dykes James, and Mr. Hendricks were in the room. She testified Mr. Hendricks wanted Dykes to go and have "the papers drawed up." Dykes was gone for perhaps an hour or two. Upon his return the following transpired:
He (Dykes) brought the deed in and showed it to Uncle Terry, and Uncle Terry read it, and he said, That's fine. That's how I wanted it.
Dykes then telephoned Mr. Calhoun, who came to the room, and read the deed to Mr. Hendricks, who told Mr. Calhoun that was *1040 how he wanted it, and signed the deed in front of Mr. Calhoun.
When Mr. Calhoun left, she said that Mr. Hendricks told Dykes to take the checks and put them in the safety deposit box. He also told Dykes to take the deed with him. She testified her husband Glynn James was not present at the time the deed transaction took place, but came to the hospital in the afternoon. According to her, when Glynn walked into the room, "... Uncle Terry told him to come over there and hug his neck, and he laughed and told him, `I got some of your money today,' and Glynn told him that was fine."
There was also a check dated July 12, payable to her in the amount of $25.00, signed by Mr. Hendricks. Her explanation of this check was:
I was always running him around, taking him to the doctor, and buying his groceries and doing things for him, and he paid me for it, paid my gas, helping him.
Another check for $25.00, dated July 18, was for the same thing. When Mr. Hendricks was discharged from the hospital July 20, either she or her husband Glynn took him home. She also took Mr. Hendricks back to the hospital July 27.
On cross-examination she testified that she checked on Mr. Hendricks on a very frequent basis following his wife's death. She delivered a check to a food drive-in for $5.19 on July 5 for Mr. Hendricks. She also took a check to the telephone company for him.
She could not remember a mineral deed being mentioned in any way by Mr. Hendricks.
On July 23, she took Mr. Hendricks to the Brookhaven Bank and Trust Company, where he got the two $5,000.00 checks from the lock box and deposited them in his checking account. After that she took him home and saw that he got his noon meal. When he went to the hospital he gave her the key to his house and instructed her to feed his cats.
She did not know how Dykes got into the house to get the deeds out of the trunk.
Neither Mrs. Helen James nor Mrs. Juanita James ever expressed any opinion concerning Mr. Hendricks' mental capacity.
The exhibits adduced at trial reveal the following:
1. The day following Mr. Hendricks' death, July 30, all funds in his checking account (totaling $46,630.96) were withdrawn by the following three checks:

 check to Brookhaven Funeral Home
 signed by Glynn R. James $ 2,383.00
 check to Dykes James signed by
 Dykes James 22,128.98
 check to Glynn James signed by Glynn
 James 22,128.98
 __________
 $46,630.96

2. Money market certificates were purchased at the Bank of Wesson by the defendants as follows:

 # 1170
 - July 30, 1979,
 Mr. or Mrs. Glynn James 20,000.00
 # 1174
 - August 5, 1979,
 Patsy J. James or
 Mrs. Helen James 12,000.00
 # 1175
 - August 5, 1979,
 Sandra Gay James or
 Dykes James 12,000.00
 # 1176
 - August 5, 1979,
 Helen James or
 Dykes James 40,000.00
 # 1177
 - August 5, 1979,
 Dykes James or
 Helen James 20,000.00

3. A financing statement was filed in the chancery clerk's office on August 20, 1979. Under the section for debtor there is typed:
Dykes, James
Rt. 1,
Wesson, Ms.
Under the section for the secured party there is typed:
Terry M. Hendricks
Under the section covering the type of property is typed:
All personal property of every kind and character and wheresoever situated, including but not limited to household furnishing and furniture.
*1041 This instrument bears no signature or date. No security agreement or note was ever produced evidencing the nature or amount of the debt from Dykes James to Terry Hendricks.[6]
4. The checking account of Mr. and Mrs. Glynn James in the Bank of Wesson shows a $2,000.00 deposit made July 30, and another $2,000.00 deposit made August 16, 1979.
The checking account of Mr. and Mrs. Dykes James in the Bank of Wesson shows a deposit of $13,303.13 on July 23, $3,060.52 on July 31, and $8,863.17 on August 20, 1979.
5. Mr. Hendricks died 5:00 p.m., July 29.

LAW

I.
Did the chancellor err in finding there was a fiduciary relationship?
Bourn v. Bourn, 163 Miss. 71, 140 So. 518 (1932), was a suit by a mother to set aside a deed she had executed to her son. This Court found there was a fiduciary relationship between them. We stated:
The rules governing conveyances between parties occupying such a fiduciary relation are the same as those governing conveyances between parties occupying the conventional fiduciary relations, such as physician and patient, attorney and client, guardian and ward, and trustee and cestui que trust. The relation and duties involved need not be legal, they may be moral, domestic, or merely personal.

Id. at 78-79, 140 So. at 520. (emphasis added).
In re Estate of Bilello, 317 So.2d 916 (Miss. 1975), involved a suit by a sister to probate a will of her deceased sister devising property to her. The evidence in that case revealed the testatrix was an alcoholic, weak in mind and in body when the will was made. The proponent visited twice daily with her sister. In affirming the chancellor's finding that a fiduciary relationship existed, we adopted the definition of Black's Law Dictionary, Revised Fourth Edition 1968, and said: "It [Black's Law Dictionary] states, among other things, that a confidential relation is not confined to any specific association of parties but appears when `on the one side there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed.'" 317 So.2d at 917.
Further on this subject, 36A C.J.S. Fiduciary (1961) contains the following observations:
Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new cases might be excluded, and have refused to set any bounds to the circumstances out of which a fiduciary relation may spring.
* * * * * *
A fiduciary relationship is not limited to legal and technical relations, and it is not necessary that the relation and duties involved be legal; they may be either moral, social, domestic or merely personal. The origin of the confidence and the source of the influence are immaterial.
Whenever there is a relation between two people in which one person is in a position to exercise a dominant influence upon the other because of the latter's dependency upon the former, arising either from weakness of mind or body, or through trust, the law does not hesitate to characterize such relationship as fiduciary in character. The basis of this relationship need not be legal; it may be moral, domestic, or personal. Nor is the law concerned with the source of such relationship. These principles are universally affirmed by courts. See Croft v. Alder, 237 Miss. 713, 115 So.2d 683 (1959); Ham v. Ham, 146 Miss. 161, 110 So. 583 (1926); Quinn v. Phipps, 93 Fla. 805, 113 So. 419 (1927); and cases cited in 36A C.J.S. Fiduciary, at 382-87.
*1042 The chancellor in this case found as a fact that a fiduciary relationship commenced on July 2, when Mr. Hendricks went to the bank and put the defendants' names on his checking account, safety deposit box, and certificates of deposit. The evidence in this case is overwhelming in support of this finding.

II.
Did the chancellor err in finding Mr. Hendricks possessed sufficient mental capacity to engage in the questioned transactions?
This question is close. There was strong medical testimony by Mr. Hendricks' attending physician over a period of years to the effect that Mr. Hendricks, in July 1979, was in no mental condition to transact serious business; there was no testimony to the contrary from any medical expert.
We have often held, however, that lay persons may express an opinion as to another's mental capacity, and the weight and credibility is for the fact finder. In re Estate of Prine, 208 So.2d 187 (Miss. 1968); McGarrh v. State, 249 Miss. 247, 148 So.2d 494 (1963); Keeler v. State, 226 Miss. 199, 84 So.2d 153 (1955); Black v. Black, 209 Miss. 353, 46 So.2d 805 (1950); and Blalock v. Magee, 205 Miss. 209, 38 So.2d 708 (1949). Lay testimony concerning the bank transactions and the execution of the warranty deed tended to support the defendants' contention that Mr. Hendricks possessed sufficient mental capacity to understand his actions in these matters.
There is no lay testimony, however, specifically directed to Mr. Hendricks' mental capacity on July 23, when he signed the bill of sale. Perhaps some implication of understanding may be claimed by the testimony of the deputy chancery clerk. Yet the deputy clerk had never met Mr. Hendricks, and he simply asked Mr. Hendricks if he knew what he was signing, and received an affirmative reply. This hardly amounts to an unequivocal opinion of mental capacity by a witness who knew and had an opportunity to observe the actions of the person under question.
We therefore conclude the chancellor's ruling, insofar as Mr. Hendricks' mental capacity on July 23 was concerned, was against the overwhelming weight of the evidence.

III.
Did the defendants offer sufficient evidence to rebut the presumption of invalidity arising from these transactions?
The record indicates that Mr. and Mrs. Hendricks lived somewhat secluded lives. They kept their business to themselves, and prior to her death, there is no evidence of third parties giving them any business or financial advice.
On this issue it is beyond dispute that when all the challenged transactions transpired, Mr. Hendricks was a chronically sick and disabled person, weak and dependent upon others for basic human needs. He was terminally ill within one month of his death. He had also just lost his wife, the only person he had depended upon, and the only person in whom he had confided. His own health and the loss of his wife had brought on a dangerous depression in which he was suicidal. Following the death of his wife, Mr. Hendricks  as the doctor testified  may have been in no mental or emotional condition to receive and understand any advice regarding his estate, regardless of its source.
Giving the defendants the benefit of this doubt, however, and assuming Mr. Hendricks did somehow residually retain the mental and emotional faculties to understand matters pertaining to the handling and disposition of his property and estate, if there ever was a case in which a man desperately needed sympathetic, competent, and independent advice from some person interested only in Mr. Hendricks' welfare, this is such a case. It is equally clear that he received no such advice.
The law watches with the greatest jealousy transactions and dealings between persons occupying a fiduciary relationship, in which the person in a position of influence receives some substantial benefit. The law *1043 will not permit them to stand, unless the circumstances demonstrate the fullest deliberation on the part of the dependent party, and the most abundant good faith on the part of the dominant party. In such transactions the law, upon a principle of public policy, to protect against the infirmities of a hasty, precipitate judgment, presumes the existence of undue influence on the part of the dominant party, and such transactions are prima facie voidable,[7] unless the dominant party shows by the clearest proof that he took no advantage of the dependent party, and that the latters's action was a result of his own free will, and upon the fullest deliberation. This Court adopted these principles of law beginning with Meek v. Perry, 36 Miss. 190 (1858), and as shown by both the majority and dissenting opinions in that case, our Court then adopted well settled principles prevailing throughout courts of this country as well as Great Britain.
In Ham v. Ham, supra, we held that in transactions such as those under scrutiny in this case a presumption of invalidity arises "... which can only be overcome, if at all, by clear evidence of good faith, of full knowledge, and of independent consent and action." 146 Miss. at 173, 110 So. at 584, quoting 2 Pomeroy Equity Jurisprudence (4th Ed.), section 957.
In that case we concluded:
The usual method of proving independent consent and action in such cases, and probably the only way it can be clearly proven, is by showing that in making the deed the grantor acted upon the advice of a competent person, disconnected from the grantee and devoted wholly to the grantor's interest.
146 Miss. at 174, 110 So. at 585 (citations omitted) (emphasis added). We have reaffirmed these principles in numerous cases. See, e.g., McDowell v. Pennington, 394 So.2d 323 (Miss. 1981); In re Will of Moses, 227 So.2d 829 (Miss. 1969); Wofford v. Wofford, 244 Miss. 442, 142 So.2d 188 (1962); Croft v. Alder, 237 Miss. 713, 115 So.2d 683 (1959); and Hickey v. Anderson, 210 Miss. 455, 49 So.2d 713 (1951). In McDowell, supra, we again stated that in such a case the law raises a presumption that the beneficiary has exercised undue influence, and "... casts upon the beneficiary the burden of disproving undue influence by clear and convincing evidence." 394 So.2d at 325, quoting Croft v. Alder, 237 Miss. at 723, 115 So.2d at 686 (emphasis added).
There was no independent advice or counsel given Mr. Hendricks by any person.
He had a conversation on July 2 in each of the two banks with a bank employee, in the presence of Mr. Dykes James.
On July 18, according to the defendants' wives, there were two conversations between Dykes James and Mr. Hendricks before the arrival of the chancery clerk, one before the deed was prepared by the attorney, and the second after the attorney had prepared the deed. After these preliminaries, the chancery clerk arrived. He read the deed to Mr. Hendricks, and asked him if he understood it, and also if he wished to sign it. It is undisputed that present in the hospital room at the time were three of the four people in the entire world who had the keenest interest in securing his signature. According to Mr. Calhoun, even the fourth, Mr. Glynn James, was present.
The deputy chancery clerk, who had no previous acquaintance with Mr. Hendricks, simply asked him if he knew what he was doing, and if he knew "what this is." This was also in the presence of Mr. Dykes James.
To hold that Mr. Hendricks had independent advice in any of these transactions would make a mockery of the rule.
In Ham v. Ham, supra, the same attorney represented both parties; we held this did not constitute independent advice.
*1044 In Watkins v. Martin, 167 Miss. 343, 147 So. 652 (1933), two neighbors, a nurse at the hospital and the grantee were present in the room when the grantor signed the deed. The grantor's doctor told the grantee that the grantor could execute the documents. The grantee explained to the grantor (his brother) that the instrument was a deed of everything to the grantee, and the grantor said that was what he wanted. We held this did not overcome the presumption of invalidity.
In Thomas v. Jolly, 251 Miss. 448, 170 So.2d 16 (1964), a notary public testified that she explained the deed to the grantor (in the presence of a grantee), and the grantor signed it of her own free will and accord. The chancellor held this did not constitute independent consent and action. We affirmed.
In Croft v. Alder, supra, a reputable attorney read the will to the testator in the hospital room (in the presence of the beneficiary), and the testator told him this was what he wanted. We said: "We do not think that the testimony of the attorney who attested the will, as to his observations at that particular time, can suffice to rebut the already existing presumption. As stated in Jamison, he naturally would have had no knowledge of any precedent activities by Barney." 237 Miss. at 730, 115 So.2d at 689. (emphasis added). See also In re Will of Moses, supra (showing the extent this Court has applied the rule).
In Jamison v. Jamison, 96 Miss. 288, 51 So. 130 (1910), referred to and followed in Croft v. Alder, supra, this Court had occasion to evaluate testimony restricted solely to the time of execution of a will. We quoted Blackman v. Edsall, 17 Colo. App. 429, 434-35, 68 P. 790, 792 (1902), as follows:
The chief complaint and contention of the proponent is that the evidence presented, and upon which the jury based its verdict sustaining its charge of undue influence, was insufficient, by reason of its lacking that affirmative and positive character which is claimed to be necessary. It follows, from the very nature of the thing, that evidence to show undue influence must be largely, in effect, circumstantial. It is an intangible thing, which only in the rarest instances is susceptible of what may be termed direct or positive proof. The difficulty is also enhanced by the fact, universally recognized, that he who seeks to use undue influence does so in privacy. He seldom uses brute force or open threats to terrorize his intended victim, and if he does he is careful that no witnesses are about to take note of and testify to the fact. He observes, too, the same precautions if he seeks by cajolery, flattery, or other methods to obtain power and control over the will of another, and direct it improperly to the accomplishment of the purpose which he desires. Subscribing witnesses are called to attest the execution of wills, and testify as to the testamentary capacity of the testator, and the circumstances attending the immediate execution of the instrument; but they are not called upon to testify as to the antecedent agencies by which the execution of the paper was secured, even if they had any knowledge of them, which they seldom have... .
96 Miss. at 297-98, 51 So. at 131 (emphasis added).
As stated in Jamison and subsequently in Croft v. Alder, proof restricted to the circumstances immediately surrounding the execution of an instrument is of limited value in cases such as this.
We feel no obligation to address the question of what in fact constitutes competent advice, totally disconnected from the grantee, and devoted wholly to the grantor's interest, because no "advice" of any kind was given in this case. It is nonetheless significant to note that no friend, advisor, or counselor of any description, disconnected from the defendants, and interested only in Mr. Hendricks, ever appeared on the scene, either at Mr. Hendricks' home or elsewhere, and counseled or advised Mr. Hendricks. Nor was the doctor, or even any attending nurse, ever asked whether Mr. Hendricks should undertake these transactions.
*1045 In short, we find nothing to indicate the slightest inclination on the part of the defendants to see that Mr. Hendricks was protected as to his property.
We must hold, therefore, that the chancellor was in error in ruling these challenged transactions valid.
Courts have a solemn obligation to uphold the genuine wishes and desires of a decedent, as expressed in a deed or a will. We cannot question the validity of transactions freely and voluntarily made by the deceased during his lifetime, simply because of some reservation we might have as to their wisdom or fairness. Of equal magnitude, however, is the duty to protect an elderly, sick, or trusting person who has been imposed upon by a dominant and over-reaching personality. We fully recognize this responsibility, and must observe that upon occasion difficulty will be encountered in determining the line between our two obligations.
This case presents no such difficulty.
Aside from what we have stated, some further questions about this case are pertinent.
The evidence in this record that Mr. Hendricks intended to give the defendants his money is not free from serious doubt. He merely stated that he wanted their names on the checking account, the certificates of deposit, and the safety deposit box with his own name. He may only have intended to put them in a position to write checks on the account to take care of his needs. This view is just as consistent as a view that he intended to make them a gift. Hence, the prudence in having some knowledgeable, independent person advise him as to his funds. Had he privately talked to the banker, the latter could have quickly ascertained his true intention (assuming Mr. Hendricks was at the time mentally competent). If he needed an attorney, the banker could have suggested he see one.[8]
As to the deed, was it a gift? If so, why was there a $10,000 consideration? If not a gift, then no person of any business judgment would ever have advised Mr. Hendricks to totally divest himself of his home and real property, not even reserving a life estate, for $10,000. Why were the two $5,000 checks put in the safety deposit box for a week? What independent counselor would have advised him to do this?
As to the bill of sale, was it a gift? Then, why was an unsigned financing statement filed on August 20, 1979, in the chancery clerk's office, the same date the deed was filed of public record?
Mr. Hendricks died at five o'clock one afternoon. The next day, perhaps the day of his funeral, the defendants appropriated unto themselves the entire checking account.
In less than a week's time far more than the total amount on deposit in the checking account and in savings appears on deposit in money market funds in another bank in the names of the defendants and their families. The defendants manifestly were astutely aware of how best to take care of finances where their own interests were concerned. Yet, in none of these challenged transactions is there any evidence of their attempting to look after Mr. Hendricks' best financial and property interests.
Apparently, they did give Mr. Hendricks a good funeral, unless part of that $2,383.00 check of July 30 was for Mrs. Hendricks' funeral.
We therefore hold that the prayer of appellants' bill of complaint should have been sustained. The deed and bill of sale to the defendants are invalid, and the defendants are liable and accountable as trustees for all personal property and funds obtained for the benefit of themselves and their families.
We reverse and render judgment for appellants in this case as to the deed and bill of sale, and reverse and remand this cause for hearing before the chancellor as to all personal property and funds obtained by *1046 the defendants for discovery and accounting, in proceedings consistent with this opinion.
REVERSED AND RENDERED IN PART AND REMANDED.
SUGG, P.J., BROOM, ROY NOBLE LEE, BOWLING, DAN M. LEE and PRATHER, JJ., concur.
WALKER, J., dissents.
PATTERSON, C.J., took no part.
NOTES
[1] The chancery clerk testified that Glynn James was also present in the hospital room when he was there.
[2] Although the mineral deed was made an exhibit to the bill and at trial, it was never signed.
[3] These checks were not drawn on Mr. Hendricks' checking account.
[4] By "deeds" Mrs. James may have been referring to the mineral deed in addition to the warranty deed. The record does not make this clear. In any event, the mineral deed was never signed.
[5] The record again is not clear whether Mr. Hendricks was referring to $5,000.00 for the mineral deed and $5,000.00 for the warranty deed. If he meant in saying "$5,000.00 apiece" that he expected $5,000.00 from Dykes and $5,000.00 from Glynn, why should Mr. Hendricks care which one of the two paid him, or that they both shared equally in the payment? Presumably he would be primarily interested in being paid the $10,000.00.
[6] The description of the property in the financing statement and in the bill of sale is identical. The bill of sale and financing statement were obviously typed on different typewriters, however.
[7] Although Meek v. Perry, 36 Miss. 190 (1858), states that such transactions are prima facie void, subsequent decisions of this Court indicate that these transactions are only voidable. See Leggett v. Graham, 218 So.2d 892 (Miss. 1969); Manning v. Hammond, 234 Miss. 299, 106 So.2d 51 (1958); and Hickey v. Anderson, 210 Miss. 455, 49 So.2d 713 (1951).
[8] A power of attorney, or a conservatorship of some kind may have better reflected the true intention of Mr. Hendricks. This would certainly have been the case if he did not intend to make a gift of these funds.