MYERS, P.J.,
 

 for the Court:
 

 
 *737
 
 ¶ 1. In October 2003, Ceasar Olive
 
 [1]
 
 executed a warranty deed conveying his home and approximately thirty-six acres of surrounding land in Madison, Mississippi, to his stepchildren, Willie McNeal and Bernice Bouldin. Olive reserved a life estate. Approximately seven months later, Olive sought to extend a one-third ownership interest in the property to one of his natural children, Betty Rugley. McNeal and Bouldin refused. Olive brought suit to set aside the deed, arguing undue influence and mutual mistake in its execution.
 
 [2]
 
 Olive testified that he had believed the instrument he executed had been a will he could revoke or modify at any time. After a brief trial, the chancellor denied relief, and Olive appeals.
 

 FACTS
 

 ¶ 2. In 2003, Olive was approximately seventy-seven years of age. Some time that year, his wife of fifty-seven years— McNeal and Bouldin’s mother — died.
 
 [3]
 
 Olive had raised McNeal and Bouldin since they were small children. No children were born to Olive’s marriage, but over the years he had fathered between seven and nine children out of wedlock. Rugley was one of these children. She had lived in California for about twenty years before returning to Mississippi after Olive’s wife’s death. Olive gave Rugley a piece of land near his home, and she began constructing a home on it. At this time, McNeal apparently lived on the same street as Olive. McNeal’s sister, Bouldin, lived in Michigan.
 

 ¶ 3. At the trial, only McNeal and Olive testified. They offered slightly different characterizations of their relationship around the time the deed was executed, but most of the material facts were not disputed. Olive was seventy-seven years old and had known McNeal, his stepson, for about fifty-six years, since McNeal was three or four years old. The two had apparently been close for much of that time. McNeal claimed to have assisted Olive in many business ventures over the years, including farming the property at issue. Olive was generally dismissive of his relationship with his stepson in his testimony, but he said little of their history before 2003. Both agreed that Olive had trusted McNeal.
 

 ¶ 4. In 2003, the year the deed was executed, McNeal'and Olive lived on the same street. When his mother entered her prolonged final illness, McNeal began cleaning her and Olive’s home weekly. He continued to clean the home after his mother’s death in 2003. After his wife’s death, Olive was injured and hospitalized in two separate incidents. During his first stay in the hospital, Olive instructed McNeal to retrieve and hold a substantial amount of money he had kept in his home. McNeal testified that it was about twenty-five thousand dollars, but Olive maintained that it had been significantly less. After Olive’s car accident, he was unable to drive “for a few weeks,” and McNeal began taking him to doctor’s appointments and to rehabilitative therapy. McNeal claimed that he would drive Olive twice a week; Olive denied this and suggested that it was less frequent. Both agreed that Rugley had also assisted Olive during this time.
 

 ¶ 5. Some time after his injuries and his wife’s death, Olive told McNeal to visit Olive’s attorney and arrange for the gift of the home and surrounding land to McNeal
 
 *738
 
 and his sister. Both agreed that Olive had not done it himself because of his injuries and because he was preoccupied with his business, an auto salvage yard. At this time, many of his vehicles were being crushed and sold for scrap, and Olive insisted that he be there to ensure that he was paid for everything that was taken. The business was apparently located on or near the property at issue.
 

 ¶ 6. Patrick Rand was Olive’s attorney and had handled transactions for him in the past, most recently in effecting the gift of some land near Olive’s home to Rugley.
 
 [4]
 
 McNeal met Rand at Rand’s office. Olive testified that he had instructed McNeal to arrange to have a will drafted. According to McNeal, Olive did not specify the method of conveyance. When he arrived at Rand’s office, Rand already had the “paperwork” for Olive’s various properties assembled. McNeal explained Olive’s wishes, and Rand drafted the deed transferring the homestead and surrounding land to McNeal and his sister, reserving a life estate for Olive. In his testimony, McNeal was unclear as to how or when the decision was made to draft a deed (it is implied that Rand made the decision or that he had been previously instructed to do so by Olive), but McNeal did state that he and Rand discussed the possibility that Olive’s natural children might attempt to get the property after Olive’s death, against his wishes.
 
 [5]
 
 McNeal stated that he believed the deed would prevent this from happening. Both Olive and McNeal claimed to have paid Rand for the work.
 

 ¶ 7. Several days after the meeting with McNeal, Rand mailed the deed and affidavit. It was addressed to McNeal, but it might have been sent to Olive’s home address.
 
 [6]
 
 McNeal testified that he explained the form of the conveyance to Olive, as Rand had to him, and that Olive understood. But McNeal also conceded that he himself did not fully understand the legal effect of the deed and had thought Olive could revoke or modify the gift at any time. He did not state whether he had communicated this understanding to Olive. Olive denied ever reading the deed or affidavit.
 

 ¶ 8. On October 27, 2003, with McNeal present, Olive executed the deed and affidavit in the Madison County Chancery Clerk’s office. The affidavit stated that:
 

 I am conveying property to my children, Willie McNeal and Bernice 0. Bouldin, reserving unto myself a life estate of the homestead property, for the reason that [they] helped farm the property during the time that I owned it. It is my wish that they, and they alone, receive my interest in the property.
 

 The instruments were recorded that day.
 

 ¶ 9. On September 27, 2004, Olive filed suit to set aside the deed for undue influence and mutual mistake in its execution. The case was finally brought to trial on May 11, 2009, and only Olive and McNeal testified. The chancellor denied relief, finding no undue influence. She also found that Olive’s testimony that he was ignorant of the nature of the instrument he had executed was not credible. Olive appeals from that judgment, arguing that the
 
 *739
 
 chancellor’s finding of no confidential relationship between Olive and McNeal was clearly erroneous. He also contends that the chancellor abused her discretion in not setting aside the deed on the ground of mutual mistake.
 

 STANDARD OF REVIEW
 

 ¶ 10. We “will not disturb the chancellor’s opinion when [it is] supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied.”
 
 Samples v. Davis,
 
 904 So.2d 1061, 1064 (¶ 9) (Miss.2004) (quoting
 
 Holloman v. Holloman,
 
 691 So.2d 897, 898 (Miss.1996)). Questions of law, however, are reviewed de novo.
 
 Amiker v. Drugs for Less, Inc.,
 
 796 So.2d 942, 945 (¶ 7) (Miss.2000).
 

 DISCUSSION
 

 1. Mutual Mistake
 

 1111. In his first issue, Olive argues that the deed should be set aside on the grounds of mutual mistake. Olive testified that he believed the document he executed was a will he could revoke at any time. He notes also that McNeal — who stated he knew the instrument was a deed — nonetheless testified that he was largely ignorant of its legal effects. McNeal admitted that he believed that because Olive had reserved a life estate, Olive could revoke the deed or modify it at any time prior to his death. As both men believed the conveyance was revokable, Olive argues, the chancellor erred in not granting the relief he requested.
 

 ¶ 12. A deed may be reformed where it is shown to result from the mutual mistake of the parties in contracting for it.
 
 Brown v. Chapman,
 
 809 So.2d 772, 774 (¶ 9) (Miss.Ct.App.2002). Although Olive advances this issue under a mutual mistake theory, we are compelled to point out that he was not required to show that McNeal had shared in his mistake. Ordinarily, a contract may not be set aside for a unilateral mistake absent proof of fraud or other inequitable conduct on the part of the benefitting party.
 
 McCoy v. McCoy,
 
 611 So.2d 957, 961 (Miss.1992). But it is undisputed that this was a voluntary conveyance — a gift that was not bargained for. The giving of a gift is a unilateral act, so mutuality of mistake is not required to set it aside.
 
 See Spencer v. Spencer,
 
 115 Miss. 71, 81, 75 So. 770, 771 (Miss.1917);
 
 Miles v. Miles,
 
 84 Miss. 624, 640, 37 So. 112, 115 (1904). Instead, the rule of law is that a deed effecting a voluntary conveyance may be reformed, at the insistence of the grant- or, if it did not carry out his intent in making the gift. “Generally, a reformation may be granted on the application of the grantor in a voluntary conveyance against the grantee, where the instrument does not express the donor’s intent.” 76 C.J.S.
 
 Reformation of Instruments
 
 § 10 (2007).
 
 See also Lawson v. Bauman,
 
 805 S.W.2d 769, 771 (Tenn.Ct.App.1990) (“[A] voluntary conveyance made without any consideration may be reformed at the suit of the grantor against the grantee.”);
 
 Kemna v. Graver,
 
 630 S.W.2d 160, 161 (Mo.Ct.App.1982) (“It is a well-settled general rule that equity will reform a voluntary instrument of conveyance at the suit of the donor when the instrument does not reflect the donor’s intent in making the gift.”). Olive only needed to show that he had mistakenly conveyed the property to McNeal and Bouldin. The chancellor, however, denied relief because she did not credit Olive’s testimony that he had executed the deed and affidavit without reading them.
 

 ¶ 13. The party seeking reformation of a deed on a mistake theory bears the burden of proof beyond a reasonable
 
 *740
 
 doubt.
 
 McCoy,
 
 611 So.2d at 961. Whether Olive mistakenly conveyed the property presents a question of fact; therefore, the issue on appeal is whether the chancellor abused her discretion in finding that Olive had failed to prove his mistake beyond a reasonable doubt.
 
 Id.
 

 ¶ 14. Olive does not dispute that he had intended to give the property to McNeal and Bouldin; he only takes issue with the form of the conveyance. Olive testified that he had instructed McNeal to visit Olive’s attorney and draft a will for him that would convey the property. McNeal returned with a deed and affidavit, which Olive alleges he executed without reviewing. Olive claimed to have discovered the mistake about six months later, when he attempted to modify the “will” to give a one-third interest in the property to his natural daughter, Rugley.
 

 ¶ 15. McNeal was somewhat unclear in his testimony as to what Olive instructed him to do at the attorney’s office. He testified that the attorney appeared to be prepared for his visit. After they discussed Olive’s wishes, the attorney prepared a deed and affidavit that were subsequently mailed to Olive’s home, addressed to McNeal. McNeal then discussed the deed with Olive and explained it to Olive as the attorney had to him.
 

 ¶ 16. The deed Olive executed is by all appearances ordinary. It is headed “Warranty Deed,” in all capital letters, bolded and underlined for emphasis, although the third and final page where Olive signed is not clearly labeled as a deed. An invoice for legal services (including “work on deed” and “draft deed and affidavit”) is found in the record, sent to McNeal at his own address — although Olive testified that he had paid for the drafting.
 
 [7]
 

 ¶ 17. We cannot find an abuse of the chancellor’s discretion in this case, as the evidence casts a reasonable doubt on Olive’s claims. The instrument Olive executed was clearly labeled a deed, and McNeal testified that he had explained the nature of the document to Olive. The execution of the deed took place in the chancery clerk’s office and without the formalities of the execution of a will. Olive was literate, and he had several opportunities to review the document. It was also noted that Olive had some experience with real estate transactions in the past, and it was never suggested that he did not know the difference between a deed and a will. Moreover, his conduct of his business suggested that Olive would not have signed a document without reviewing it; around the time he executed the deed, Olive insisted on personally observing the removal of scrap cars from his salvage yard. McNeal did admit that he was largely ignorant of the deed’s legal effect and that he had personally believed the conveyance was revokable, but he never testified that he had told this to Olive. Certainly, Olive had an opportunity to discuss the deed with his attorney himself if he was uncertain as to its effect. On the whole, Olive’s account is uncorroborated and appears improbable.
 

 ¶ 18. We conclude that the chancellor did not abuse her discretion in finding Olive’s testimony not credible and, consequently, that she did not abuse her discretion in finding that Olive did not meet his burden to prove mistake beyond a reasonable doubt. This issue is without merit.
 

 
 *741
 
 2. Undue Influence; Confidential Relationship
 

 ¶ 19. Olive next argues that the chancellor erred in not finding that a confidential relationship existed between Olive and McNeal. If a confidential relationship existed, Olive contends, the chancellor erred in not enforcing a presumption of undue influence in the inter vivos gift.
 
 See Murray v. Laird,
 
 446 So.2d 575, 578 (Miss.1984).
 

 ¶ 20. Mississippi law recognizes that “an inter vivos gift is a perfectly lawful means of transferring real property in this state.”
 
 In re Estate of Lane v. Henderson,
 
 930 So.2d 421, 425 (¶ 11) (Miss.Ct.App.2005) (quoting
 
 Anderson v. Burt,
 
 507 So.2d 32, 36 (Miss.1987)). Gifts between family members are a normal occurrence, and “a deed from a parent to a child alone and of itself raises no presumption of undue influence since, in the absence of evidence to the contrary, the parent is presumably the dominant party. This is true even though the parent is aged, or aged and infirm.”
 
 Id.
 
 (quoting
 
 Thomas v. Jolly,
 
 251 Miss. 448, 454-55, 170 So.2d 16, 19 (1964)). “On the other hand, where a deed has been procured by one in contravention of duties owed the grantor by reason of a confidential or fiduciary relationship existing in law or in fact, our courts will not hesitate to intervene.”
 
 Anderson,
 
 507 So.2d at 36.
 

 ¶ 21. A confidential relationship arises where “on the one side there is an overmastering influence, or, on the other, weakness, dependance, or trust, justifiably reposed.”
 
 Hendricks v. James,
 
 421 So.2d 1031, 1041 (Miss.1982). A confidential relationship “[does] not have to be a legal one ... the relation may be moral, domestic, or personal.”
 
 Murray,
 
 446 So.2d at 578. To determine whether a confidential relationship exists, the following factors must be considered:
 

 (1) whether one person has to be taken care of by others, (2) whether one person maintains a close relationship with another, (3) whether one person is provided transportation and has their medical care provided for by another, (4) whether one person maintains joint accounts with another, (5) whether one is physically or mentally weak, (6) whether one is of advanced age or poor health, and (7) whether there exists a power of attorney between the one and another.
 

 In re Estate of Holmes v. Holmes-Price,
 
 961 So.2d 674, 680 (¶ 17) (Miss.2007).
 

 ¶ 22. “The party asserting that a confidential relationship exists has the burden of establishing such a relationship by clear and convincing evidence.”
 
 In re Estate of Lane,
 
 930 So.2d at 425 (¶ 12) (quoting
 
 Foster v. Ross,
 
 804 So.2d 1018, 1021 (¶ 11) (Miss.2002)). Whether a confidential relationship exists is a question of fact, and this Court cannot disturb a chancellor’s findings of fact if they are supported by substantial credible evidence.
 
 Samples,
 
 904 So.2d at 1064 (¶ 9);
 
 Lowery v. Guar. Bank and Trust Co.,
 
 592 So.2d 79, 85 (Miss.1991). We will only reverse if the chancellor “abused [her] discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied.”
 
 Samples,
 
 904 So.2d at 1064 (¶ 9) (quoting
 
 Holloman,
 
 691 So.2d at 898).
 

 ¶ 23. The chancellor found no confidential relationship between Olive and McNeal. The question presented on appeal, therefore, is whether the chancellor abused her discretion in finding that Olive failed to prove the existence of a confidential relationship by clear and convincing evidence.
 

 ¶ 24. Considering the evidence as we have detailed it above, we cannot find an abuse of discretion. It is true that Olive was seventy-seven years of age, had re
 
 *742
 
 cently lost his wife of many years, and was recovering from a car accident at the time of the conveyance. These circumstances may have created a potential for weakness or dependence, but the record does not bear this out. Olive continued to live alone, with some assistance from his children, and continued to operate his own business. Despite his age and injuries, nothing in the record suggests that Olive suffered from any permanent or severe physical infirmity
 
 [8]
 
 or any loss of mentation whatsoever. Olive’s own testimony at trial downplayed his reliance on his stepson, and Olive suggested that he had received similar help from others.
 

 ¶25. Both parties agreed that Olive had trusted McNeal, but from all appearances in the record it was trust in his stepson’s integrity and competence rather than reliance on his judgment or counsel. The only exception would be the execution of the deed in question, but the chancellor did not find Olive’s testimony in that respect to be credible. Moreover, in all of their dealings described in the record, McNeal appeared to be very deferential to his stepfather.
 

 ¶ 26. Our law presumes that a parent is the dominant party in the parent/child relationship, absent of proof to the contrary.
 
 In re Estate of Lane,
 
 930 So.2d at 425 (¶ 11). This presumption has not been rebutted; instead, the record suggests the opposite, that Olive remained dominant. Certainly, Olive did not show by clear and convincing evidence that McNeal exerted an “overmastering influence” over him.
 
 See Hendricks,
 
 421 So.2d at 1041. We find no abuse of discretion in the chancellor’s decision on this issue.
 

 ¶ 27. THE JUDGMENT OF THE CHANCERY COURT OF MADISON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE, P.J., GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ„ CONCUR. IRVING, J., NOT PARTICIPATING.
 

 [1]
 

 .Ceasar is sometimes called "Caesar” in the record, but the former spelling is used more frequently.
 

 [2]
 

 . Olive also alleged fraud, but he did not attempt to prove it at trial.
 

 [3]
 

 . She is not named in the record.
 

 [4]
 

 . The record is silent as to the form of this conveyance.
 

 [5]
 

 . Apparently, Olive had a falling out with some of his natural children during his wife’s final illness.
 

 [6]
 

 .McNeal testified that he sometimes received mail at Olive’s home and that the deed and affidavit had been sent there and kept there for about three weeks before being executed. However, the record contains a cover letter from the attorney that was apparently sent with the deed; it is addressed to McNeal's address.
 

 [7]
 

 . Both men claimed to have paid for the drafting, but it is worth noting that both recalled the total cost of Rand's services as being significantly less than indicated on the invoice in the record; from the parties testimony it appears at least possible that both Olive and McNeal had paid some portion of the bill.
 

 [8]
 

 . It was stated that Olive had poor hearing since before the events at issue and that he required the use of a hearing aid at trial (six years later), but there was no testimony that this had materially impacted his daily life during the relevant period.