# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2003-CA-00123-SCT

*JULIE MABUS*

*v.*

*ST. JAMES EPISCOPAL CHURCH, EPISCOPAL DIOCESE OF MISSISSIPPI, INC.,[1] AND JERRY McBRIDE*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/18/2002 |
| TRIAL JUDGE: | HON. BOBBY BURT DeLAUGHTER |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | KATHRYN N. NESTER |
| | SHAWNA A. MURRELL |
| ATTORNEYS FOR APPELLEES: | CHARLES EDWIN ROSS |
| | BRENDA CURRIE JONES |
| | DORRANCE AULTMAN |
| | CHRISTOPHER OWEN MASSENBURG |
| NATURE OF THE CASE: | CIVIL - TORTS-OTHER THAN PERSONAL INJURY & PROPERTY DAMAGE |
| DISPOSITION: | AFFIRMED - 10/07/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## CONSOLIDATED WITH
## NO. 2003-IA-00439-SCT

*JERRY McBRIDE*

*v.*

*JULIE MABUS*

---

[1]The proper name for this appellee is the Protestant Episcopal Church in the Diocese of Mississippi.

DATE OF JUDGMENT:                01/06/2003
TRIAL JUDGE:                    HON. BOBBY BURT DeLAUGHTER
COURT FROM WHICH APPEALED:     HINDS COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:        ROBERT A. MALOUF
ATTORNEYS FOR APPELLEE:        KATHRYN N. NESTER
                                      SHAWNA A. MURRELL
NATURE OF THE CASE:            CIVIL - TORTS-OTHER THAN PERSONAL
                                      INJURY & PROPERTY DAMAGE
DISPOSITION:                    AFFIRMED AND REMANDED - 10/07/2004
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     Julie Mabus filed suit in the First Judicial District of Hinds County Circuit Court against St. James Episcopal Church, Protestant Episcopal Church in the Diocese of Mississippi, and Jerry McBride (a former priest at St. James). Julie asserted seven separate causes of action against the defendants: breach of fiduciary duty, fraudulent concealment, negligent misrepresentation, invasion of privacy, negligent infliction of emotional distress, negligent retention/supervision, and clergy malpractice. This lawsuit is based upon McBride's participation in the surreptitious tape recording of a conversation between Julie, McBride, and Julie's then-husband, Ray Mabus. All defendants filed a motion to dismiss all claims, which was denied by the trial court, the Honorable L. Breland Hilburn, presiding. In a 4-4-1 decision, this Court denied Defendants' Petition For Interlocutory Appeal. *Mabus v. St. James Episcopal Church*, No. 2001-M-01558 (Miss. Nov. 29, 2001). Defendants' petition for certiorari to the United States Supreme Court was denied. *Protestant Episcopal Church v. Mabus*, 535 U.S. 1054, 122 S. Ct. 1910, 152 L. Ed. 2d 821 (2002).

2

¶2.    Defendants then filed a motion for partial summary judgment based upon the breach of fiduciary duty claims. Although Julie did respond, she did not file any opposing affidavits. Upon Judge Hilburn's leaving the bench, the case was reassigned to the Honorable Bobby B. DeLaughter. On August 21, 2002, Judge Delaughter issued a sixteen-page Memorandum Opinion Regarding Defendants' Motion for Partial Summary Judgment on Plaintiff's Breach of Fiduciary Duty Claims. In doing so, the trial court found that "[t]he general priest-parishioner relationship is not enough to establish a fiduciary duty under Mississippi law." The trial court noted that "whether a fiduciary relationship exists, depends upon factual circumstances, not upon professional standards of conduct for the average reasonable member of the clergy." *Julie Mabus v. St. James Episcopal Church*, Civ. Action No. 01-23 (Hinds Cty. Cir. Ct. Aug. 21, 2002)(citing *Doe v. Evans*, 718 So.2d 286, 291 (Fla. Dist. Ct. App. 1998)(opinion quashed in *Doe v. Evans*, 814 So.2d 370, 377 (Fla. 2002); *F.G. v. MacDonell*, 150 N.J. 550, 696 A.2d 697 (1997); *Moses v. Diocese of Colorado*, 863 P.2d 310 (Colo. 1993); *Doe v. Hartz*, 52 F. Supp. 2d 1027, 1065 (N.D. Iowa 1999); *Langford v. Roman Catholic Diocese of Brooklyn*, 271 A.D.2d 494, 705 N.Y.S.2d 661 (2000)). However, in this case, the trial court ruled Julie had failed to prove "that she was a dependent person or reposed any trust or confidence in defendant McBride" and that therefore summary judgment was appropriate.

¶3.    Defendants then filed a second motion for summary judgment as to the remaining claims. Julie filed a motion requesting that Judge Delaughter recuse himself based upon the second-to-last paragraph of the court's order, which stated: "[t]he Mabus children, two young girls, twelve and ten years of age, deserve some measure of privacy and this Court is not willing to even incidentally sacrifice that peace of mind upon the altar of their mother's vain pursuit of lucre." The motion to recuse was denied. At the hearing, the trial court invited both parties to provide additional information. Julie filed an affidavit in opposition to the

Defendants' claims. The motion for summary judgment was granted on all counts as to all defendants with the exception of the fraudulent concealment claim against McBride, individually. Julie has appealed the trial court's grant of summary judgment and the denial of the motion to recuse; with our permission McBride has appealed the denial of summary judgment as to the fraudulent concealment claim against him.

**FACTS**

¶4. Most of the facts in this case are undisputed. The cause of action arises from McBride's participation in the tape recording of his meeting with Ray and Julie on January 7, 1998. At the time of the meeting, Ray and Julie were married, and McBride was the pastor at St. James Episcopal Church in Jackson, Mississippi where the Mabuses attended. Julie was an active, lifelong member of St. James. McBride officiated at the Mabuses' wedding and baptized both of their children. In addition to serving as their pastor, McBride was a close personal friend of both Ray and Julie. Ray invited McBride to be present when he confronted Julie with his knowledge of her purported infidelity several days prior to the meeting, and Ray told McBride that he intended to record the conversation on the advice of his divorce attorney. Julie's sister was also invited to attend the meeting, but she did not attend because her airline flight into Jackson was canceled due to inclement weather.

¶5. The meeting took place in the Mabuses' home. The trial court found that "the purpose of the confrontation and surreptitious recording was to obtain evidence for Ray Mabus to use as leverage in attempting to get Julie to agree to a no-fault divorce." Julie did not know that Ray was recording the meeting nor was she aware that the purpose of the meeting was to confront her with her purported infidelity. Ray later testified in a deposition that he told Julie that he "wanted to talk to her about something important with McBride present." Ray also testified that he believed McBride's "participation could possibly help

4

save the marriage." However, by way of affidavit, Ray stated that "this meeting was not in any way a 'counseling session.'"

¶6. What is clear from the transcript of the meeting is the fact that Ray presented his wife with three options: save the marriage, no-fault divorce, or "we go to war" which would include an alienation of affection suit against her alleged paramour. The first option was instantly dismissed by Julie, and it was readily discernible that custody of the children would be a major point of disagreement. Julie expressed confusion as to why McBride was present. McBride responded at times that he was there for Ray and at other times for both of them. Julie was combative and used profanity during the course of this confrontation and likewise begged and pleaded for custody of her children. At one point, McBride sent Ray out of the room. With Julie still upset, McBride assured Julie that he was not there to ambush her, that he was there by her side, and that she was not alone. Soon afterwards, McBride left the home. Julie asserts that, after leaving the Mabus household, McBride told several other people of the conversation regarding Julie's alleged infidelity.

¶7. Divorce proceedings ensued between the Mabuses.[2] Although the transcript was not introduced as evidence, Ray's expert witness used the transcript in reaching his determination that Ray was the more stable parent and should have custody of the children. Ray was awarded legal custody of the children, with both parties gaining joint physical custody. During the divorce proceedings, Julie learned that the January 7 meeting was taped. She subsequently filed suit against McBride, the church, and the diocese.

¶8. Both Julie and McBride have filed appeals. Julie is appealing the order granting summary judgment in favor of all defendants on all counts, except fraudulent concealment against McBride individually.

---

[2]This resulted in protracted litigation and considerable involvement by this Court. *See Mabus v. Mabus*, 847 So.2d 815 (Miss. 2003); *Mabus v. Mabus*, 2003 WL 327669 (Miss. 2003).

Because the trial court certified that order as final under M.R.C.P. 54(b), Julie seeks reversal. Since the trial court denied summary judgment to McBride only on the fraudulent concealment count, McBride petitioned this Court for an interlocutory appeal, asking this Court to reverse the trial court's denial of summary judgment as to him, individually, on the fraudulent concealment count. We granted McBride's petition. *See* M.R.A.P. 5. Both appeals have been consolidated and will be discussed simultaneously.

¶9.     Julie has raised the following issues on appeal:

> I.      Whether the trial court erred in dismissing her claim of breach of fiduciary duty against the priest and/or the church.
>
> II.     Whether the trial court erred in dismissing her negligence claims, including negligent misrepresentation, negligent infliction of emotional distress, clergy malpractice, and negligent supervision and retention, against the priest, church, and/or diocese.
>
> III.    Whether the trial court erred in dismissing her fraudulent concealment claim against the church and diocese.
>
> IV.     Whether the trial judge erred in failing to recuse himself from consideration in this case.

The church and diocese disagree and restate the issues in the form of sixteen questions. Julie argues that a number of the issues while the church and diocese attempt to raise are not properly before this Court.

¶10.    In his appeal, McBride has raised the following issues:

> I.      Whether the trial court should have abstained from the acceptance of jurisdiction in this ecclesiastical matter.
>
> II.     Whether the trial court erred in denying McBride's motion for summary judgment regarding fraudulent concealment because McBride did not owe a duty to Julie to inform her that her husband was taping the conversation.
>
> > A.      That McBride's ecclesiastical duties as a priest may not form the basis of a fiduciary duty consistent with the First Amendment to the United States Constitution.

6

B.      That the trial court determined from the evidence that neither a confidential relationship nor a fiduciary relationship existed between McBride and Julie.

III.    Denial, Concession, and Estoppel.

IV.     The trial court committed several reversible errors in denying McBride's motion for summary judgment on the fraudulent concealment claim.

A.      The trial court's interpretation of *L.S.* and *Attorney M.*

B.      The trial court failed to follow Miss.R.Civ.P. 56.

C.      The trial judge denied McBride's motion for summary judgment on the basis of "fraud", a cause of action which has not been raised.

C.[sic] The trial court erred by making unsupported factual and legal inferences concerning the outcome of the Mabus divorce matter, and the trial court's opinion impeaches the judgment of the Chancellor who decided the Mabus divorce.

D.      The transcript of the taped conversation reveals that there is no causal relationship between McBride's "wheedling" and "cajoling" and Julie's alleged admission of an extramarital affair, further the transcript reveals that Julie was not "justifiably relying" on McBride.

Julie asserts that McBride's brief raises a number of issues outside the order permitting this interlocutory appeal.

## ANALYSIS

### I.      Jurisdiction

¶11.    The first question we must address is whether this case presents an ecclesiastical matter which is barred from our consideration by the First Amendment of the United States Constitution. With its simplistic wording belying its magnitude, the First Amendment states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . ." U.S. Const. amend. I. In applying the First Amendment, this Court has held this statement sacred.

> As a civil court, we, of course, could not and do not consider or decide any question of ecclesiastical law or church doctrine; therefore, our decision is in accord with *Maryland and Virginia Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970).

*Stegall v. Newsom*, 326 So.2d 803, 807 (Miss. 1976). "If nowhere else, in the relation between Church and State, good fences make good neighbors." *Ill. ex rel. McCollum v. Bd. of Educ.*, 333 U.S. 203, 232, 68 S.Ct. 461, 475, 92 L.Ed. 649, ___ (1948) (Frankfurter, J., concurring).

¶12.     Courts have recognized two theories under the First Amendment that would prohibit courts from examining ecclesiastical matters: the Establishment Clause and the Free Exercise Clause. The First Amendment prohibits civil courts from resolving the interpretation of religious doctrine. *See Jones v. Wolf*, 443 U.S. 595, 602, 99 S.Ct. 3020, 3025, 61 L.Ed.2d 775, ___ (1979) (applying neutral-principles approach to property dispute); *see also Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 710, 96 S.Ct. 2372, 2381, 49 L.Ed.2d 151, ___ (1976); *Maryland & Va. Eldership of Churches v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 368, 90 S.Ct. 499, 500, 24 L.Ed.2d 582, ___ (1970); *Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Church*, 393 U.S. 440, 449, 89 S.Ct. 601, 606, 21 L.Ed.2d 658, ___ (1969); *Mallette v. Church of God Int'l*, 789 So.2d 120 (Miss. Ct. App. 2001). Nor may the government hold religious groups to a higher standard or impose special duties or burdens on the basis of a religious status. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993); *Bd. of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1984); *McDaniel v. Paty*, 435 U.S. 618, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978) (plurality opinion) (striking down law prohibiting cleric from holding elected office).

¶13. Mississippi's Constitution has a counterpart to the First Amendment. Miss. Const. art. 3, § 18 (1890).[3] Mississippi also has another constitutional guaranty to every Mississippian arising from the Adequate Remedy Clause.[4] *Id.* art. 3, § 24. Both clauses are recognized by this Court and will be enforced, at least to the extent that the Adequate Remedy Clause does not clash with the First Amendment. The Fifth Circuit has held: "[t]hat the First Amendment does not categorically insulate religious relationships from judicial scrutiny, for to do so would necessarily extend constitutional protection to the secular components of these relationships." *Sanders v. Casa View Baptist Church*, 134 F.3d 331, 335-36 (5th Cir. 1998).

¶14. Thus, to the extent that this case can be considered without pressing into ecclesiastical matters, jurisdiction over the subject matter of this case is not barred by the First Amendment. However, throughout the Amended Complaint, Julie asserts that "at all times," McBride "was acting as the spiritual leader" of the Church and Diocese and in furtherance of their "goals and interests." Each defendant vigorously argues that this is an ecclesiastical matter and that the Court should abstain from jurisdiction over this matter. Julie argues that McBride's actions have no ecclesiastical justification. "Consequently, to invoke the protection of the First Amendment for conduct taking place within his counseling relationships with the plaintiffs, [the pastor] must assert that the specific conduct allegedly constituting a breach of his professional and fiduciary duties was rooted in religious belief." *Sanders*, 134 F.3d at 337-38 (citing

---

[3]Art. 3, Section 18, states: "No religious test as a qualification for office shall be required; and no preference shall be given by law to any religious sect or mode of worship; but the free enjoyment of all religious sentiments and the different modes of worship shall be held sacred. The rights hereby secured shall not be construed to justify acts of licentiousness injurious to morals or dangerous to the peace and safety of the state, or to exclude the Holy Bible from use in any public school of this state."

[4]Art. 3, Section 24 states: "All courts shall be open; and every person for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice shall be administered without sale, denial, or delay."

*Employment Div. v. Smith*, 494 U.S. 872, 881, 110 S.Ct. 1425, 1601, 67 L.Ed.2d 624 (1981);

*Wisconsin v. Yoder*, 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972); *see also*

*Destefano v. Grabrian*, 763 P.2d 275, 283-84 (Colo. 1988) ("In the spiritual counseling context, the

free exercise clause is relevant only if the defendant can show that the conduct that allegedly caused

plaintiff's distress was in fact part of the belief and practices of the religious group.");*F.G. v. MacDonell*,

150 N.J. 550, 696 A.2d 697, 702 (1997) (holding that in order to be protected, the "conduct at issue must

have been part of the beliefs and practices of the defendant's religion")).

¶15.    A review of the transcript reveals no discussion of the Scriptures or religion and only one mention

of God.[5]    Rather, the conversation was explosive in that it was one man confronting his wife with

knowledge of her purported infidelity without any notice to her as to what the arranged meeting was about,

and this conversation took place in the presence of another man, who apparently had been through some

sort of similar experience.  The transcript does not reveal marital counseling by McBride, but rather a

confrontation initiated by Ray in an effort to get his wife to admit to an adulterous affair.  The wife, reacting

to being "backed into a corner," lashed out at times and at other times pleaded that her husband not take

the children away from her.  Other than the fact that the third person present was a priest, there is no

indication of any spiritual or other counseling occurring.

## II.    Summary Judgment.

¶16.    The trial court granted summary judgment in favor of the defendants as to all counts, with the

exception of the count of fraudulent concealment against McBride, individually.  The only count uncontested

---

[5]When McBride and Julie were alone, McBride stated: "So what is that you and Ray are gonna
have to work it out. Let me tell you the truth here, let me tell you the real God's honest truth."

10

by either party is the dismissal of the invasion of privacy, which Julie's counsel conceded was barred by the statute of limitations.

¶17.    Our appellate review of the grant or denial of summary judgment is well settled:

> For a summary judgment motion to be granted, there must exist no genuine issue of material fact, and the moving party must be entitled to judgment as a matter of law. Miss. R. Civ. P. 56(c). The standard of review of a trial court's grant of a motion for summary judgment is de novo. *Short v. Columbus Rubber & Gasket Co.*, 535 So.2d 61, 63 (Miss.1988). The burden of demonstrating that there is no genuine issue of material fact falls upon the party requesting the summary judgment. *Id.* at 63-64. The court must carefully review all evidentiary matters before it; admissions in pleadings, answers to interrogatories, depositions, affidavits, etc., in the light most favorable to the party against whom the motion for summary judgment is made. *McFadden v. State*, 542 So.2d 871, 874 (Miss.1989).
>
> When a motion for summary judgment is made and supported as provided in Rule 56, an adverse party may not rest upon the mere allegations or denials of his pleadings, his response must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him. If any triable issues of fact exist, the lower court's decision to grant summary judgment will be reversed. Otherwise, the decision is affirmed.

*Corey v. Skelton*, 834 So.2d 681, 684 ¶7 (Miss. 2003) (citing *Miller v. Meeks*, 762 So.2d 302, 304 (Miss. 2000) (citing *Brown v. Credit Ctr., Inc.*, 444 So.2d 358, 362 (Miss.1983))).

¶18.    With the exception of the claim for negligent supervision and retention, Julie seeks to impose vicarious liability on the Church and Diocese for the actions of McBride.   We have stated:

> An employer is liable for the torts of his employee only when they are committed within the scope of employment. *Odier v. Sumrall*, 353 So.2d 1370, 1372 (Miss. 1978). To be "within the scope of employment," the act must have been committed in the course of and as a means to accomplishing the purposes of the employment and therefore in furtherance of the master's business. *Sears, Roebuck & Co. v. Creekmore*, 199 Miss. 48, 23 So.2d 250, 252 (1945); *Alden Mills v. Pendergraft*, 149 Miss. 595, 115 So. 713, 714 (1928). Also included in the definition of "course and scope of employment" are tortious acts incidental to the authorized conduct. *Creekmore*, 23 So.2d at 252. Stated another way, a master will not be held liable if the employee "had abandoned his employment and was about some purpose of his own not incidental to the employment." *Odier*, 353 So.2d at 1372 (citing *Loper v. Yazoo & M.V.R. Co.*, 166 Miss. 79, 145

So. 743 (1933); ***Canton Cotton Warehouse Co. v. Pool***, 78 Miss. 147, 28 So. 823
(1900)). That an employee's acts are unauthorized does not necessarily place them outside
the scope of employment if they are of the same general nature as the conduct authorized
or incidental to that conduct. ***Southern Bell Tel. & Tel. Co. v. Quick***, 167 Miss. 438,
149 So. 107, 109 (1933).

***Adams v. Cinemark USA, Inc.***, 831 So.2d 1156, 1159 ¶ 9 (Miss. 2002). "[W]here an agent commits

a malicious act based on the agent's own personal motive and where the principal does not authorize or

ratify the act, the principal is not vicariously liable." ***McClinton v. Delta Pride Catfish, Inc.***, 792

So.2d 968, 976 ¶ 24 (Miss. 2001) (citing ***Forrest County Cooperative Ass'n v. McCaffrey***, 253

Miss. 486, 176 So.2d 287, 290 (1965)). Thus, we apply this standard in analyzing whether the Church

and Diocese should be held liable in the case sub judice.

### A.      Breach of Fiduciary Duty.

¶19.    In a matter of first impression within this state, the issue is whether a parishioner may maintain a

cause of action against her priest and/or Church and/or Diocese for breach of fiduciary duty.    The trial

court found that "[t]he general priest-parishioner relationship is not enough to establish a fiduciary duty

under Mississippi law."  The trial court further found:

> [T]hat a priest, in the State of Mississippi, is to be treated as anyone else by the courts and
> his frock should not shield him from liability for conduct not tolerated from any other
> member of society. Conversely, however, the law may not impose any higher legal duty
> upon a priest than it would on any other person because doing so would erode the wall of
> separation between religion and government erected by the Founding Fathers in the First
> Amendment.

The trial court noted that "whether a fiduciary relationship exists, depends upon factual circumstances, not

upon professional standards of conduct for the average reasonable member of the clergy." However, in

this case, the trial court ruled that summary judgment was appropriate because Julie had failed to prove

"that she was a dependent person or reposed any trust or confidence in defendant McBride."

¶20. We agree with the trial judge that a priest's position alone is insufficient to establish a fiduciary relationship. If this Court were to recognize such a duty on the basis of a position held within the church, we would necessarily be required to define a reasonable duty standard and to evaluate McBride's conduct compared to that standard. To do so would violate the First Amendment.

¶21. But, this does not end the inquiry. The next question is whether under these facts, a person who happens to be a priest, can be in a fiduciary relationship with someone who happens to be one of his parishioners. Although the Mississippi appellate courts have never specifically addressed whether a fiduciary or confidential relationship can exist between a member of the clergy, a diocese, or church and an individual parishioner, the trial court found that "Mississippi doctrine appears to leave the door open for recognition of such a relationship in appropriate circumstances."

¶22. The Church responds that each of Julie's claims are nothing more than a claim for clergy malpractice. Other courts have distinguished actions for clergy malpractice from breach of fiduciary duty. *Destefano v. Grabrian*, 763 P.2d 275 (Colo. 1988) (the fundamental difference between breach of fiduciary duty and clergy malpractice "is the former is a breach of trust and does not require a professional relationship or a professional standard of care, while the latter is an action for negligence based upon a professional relationship and a professional standard of care."). Whether a fiduciary relationship exists depends upon factual circumstances, not upon professional standards of conduct for a reasonable member of the clergy. *Doe v. Hartz*, 52 F. Supp. 2d 1027, 1062 (N.D. Iowa 1999) (finding that breach-of-fiduciary-duty claims against members of the clergy are not barred ab initio, but that the question under Iowa law is whether facts giving rise to a fiduciary relationship and consequent duties have been alleged); *Moses v. Diocese of Colorado* 863 P.2d 310 (Colo. 1993) (using neutral principles of law to uphold findings of liability against diocese and bishop for breach of fiduciary duty based on sexual

13

relationship between assistant priest and parishioner in counseling session); *Destefano v. Grabrian*, 763 P.2d at 284-86; *Doe v. Evans*, 814 So.2d 370 (Fla. 2002) (a breach of fiduciary duty claim is not tantamount to a clergy malpractice claim); *F.G. v. MacDonell*, 150 N.J. 550, 696 A.2d 697 (1997) (enabling parishioner to maintain a cause of action for breach of fiduciary duty against rector for initiating and sustaining sexual relationship in context of pastoral counseling relationship).

¶23.    Mississippi law is well-settled in that in order to establish a claim for breach of fiduciary duty, Julie must first establish a duty.  A fiduciary duty is established:

> Whenever there is a relation between two people in which one person is in a position to exercise a dominant influence upon the former, arising either from weakness of mind or body, or through trust, the law does not hesitate to characterize such a relationship as fiduciary in character.

*Mullins v. Ratcliff* 515 So.2d 1183, 1191 (Miss. 1987) (citing *Hendricks v. James*, 421 So.2d 1031, 1041 (Miss. 1982)).  "The relationship arises when a dominant, overmastering influence controls over a dependent person or trust justifiably reposed." *Id.* (citing *Hendricks*, 421 So.2d at 1041; *McDowell v. Pennington*, 394 So.2d 323 (Miss. 1981); *Croft v. Alder*, 237 Miss. 713, 115 So.2d 683 (1959)).  Julie asserts that McBride was present as a marital counselor and that a fiduciary relationship is created under a counselor-counselee relationship, citing *Doe v. Evans*, 814 So.2d 370, 374 (Fla. 2002); *Eckhardt v. Charter Hosp. of Albuquerque, Inc.*, 124 N.M. 549, 953 P.2d 722, 727 (N.M. Ct. App. 1997); *MacDonald v. Clinger*, 84 A.D.2d 428, 446 N.Y.S.2d 801, 805 (1982).

¶24.    Here, the trial court found that summary judgment was appropriate inasmuch as  Julie had failed to submit any evidence that she reposed any trust or confidence in McBride or that she was a dependent person. Ray testified that he sought the assistance of McBride because he "believed that his participation could possibly help save the marriage."  However, by affidavit, Ray testified that "this meeting was not in

14

any way a 'counseling session'." Although Julie asserts in her complaint that the meeting was a marital counseling session with her priest,[6] her words at the beginning of the conversation indicate that she did not know the purpose of the meeting. Julie asked Ray prior to McBride's arrival: "Is it about me?" and "What triggered your return?" Then, upon McBride's arrival and after presenting the Mabuses with a Christmas gift, McBride said: "Let me tell you why I'm here. . . . I'm here because I love you and I love Ray."[7] Shortly thereafter, Ray confronted Julie with his knowledge of her extra-marital affair. While Mississippi law does not require any "magic words," there must be evidence that both parties understood that a special trust and confidence was being reposed. ***Lowery v. Guar. Bank & Trust Co.***, 592 So.2d 79, 84 (Miss. 1991) (citing ***Stone v. Davis***, 66 Ohio St. 2d 74, 419 N.E.2d 1094 (1981)). *See also **Dunn v. Dunn***, 786 So.2d 1045, 1052 (Miss. 2001) ("In determining whether a fiduciary relationship exists, we have to look to see if one person depends upon another.").

---

[6]Amended Complaint ¶ 7.

[7]The transcript reflects the following dialog:

| | |
|---|---|
| McBride: | Let me tell you why I'm here. |
| Julie: | Okay. |
| McBride: | I'm here because I love you and I love Ray. |
| Julie: | Uhm-hmn |
| McBride: | And you know that. |
| Julie: | Uhm-hmn |
| McBride: | Okay. That [sic] why I'm here, that's it. |
| Julie: | Okay. |
| McBride: | I'm gonna be here for the both of you. |
| Julie: | Okay. |
| McBride: | Regardless. None of this is fun. |
| Julie: | Okay. |
| McBride: | I just want you to know that and that, that's, that's why I'm here. |
| Julie: | Okay. |
| Ray: | I'd rather do anything than this. The only thing that I ask is to listen to the whole thing. |
| Julie: | Okay. |

¶25. The evidence presented reveals that Julie was not dependent upon McBride, nor that she reposed any trust or confidence in him. Julie told McBride: "I don't understand why you're here." Julie indicated that she was "in a corner" and had been "castrated." Julie then asked Ray: "Why didn't you let me have somebody here like Jerry?" Julie later told McBride: "You didn't even let me have somebody here. . . Oh, I told Ray that you sabotaged me, you ------ and I'm gonna come after you, and I am. I am furious." After reviewing the transcript and listening to Julie's argument that a jury should be allowed to interpret the conversation, the trial court found that Julie's words "leave nothing at all to interpretation or imagination."

¶26. On the other hand, when one views the transcript in the light most favorable to Julie, there can be little doubt that without any prior notice, Julie was confronted by Ray and her priest with an alleged extra-marital affair. With Julie being in a vulnerable position and in fear of losing custody of her children, her priest sent her husband out of the room so that they could talk privately. With only McBride and Julie in the room, the conversation continued:

| McBride: | Ray, get out, go back to the back room. |
| Julie: | (unintelligible) |
| McBride: | Listen, sit back. |
| Julie: | You don't have a right to be touching me Jerry, move back. |
| McBride: | Sit back and let me talk a minute. Ok. Sit back. (UI) because I love you and I want you to. And I'm not gonna let you, I'm not gonna let you do anything to me that not true. I'll take responsibility, this is not fun for me. I didn't want to be here. |
| Julie: | Then why are you here? |
| McBride: | Because I love you and I didn't want you to be alone. This is not a contest, it's gonna be bad enough. It's gonna be bad enough. |
| Julie: | No, it's not gonna be bad enough. I'll give up my rights, everything I'm entitled to and I'll ------- walk away. And I'll walk away with my children and he'll be able to see the children whenever he wants to. That's all I want. |
| McBride: | But ya'll have to work. |
| Julie: | That's all I want, it's that simple. |

16

| | |
|---|---|
| McBride: | It's not that simple, Julie. |
| Julie: | Yes it is. |
| McBride: | cause, cause (UI) |
| Julie: | I didn't fault you for (UI) with Jerry (UI) You look at my (UI) |
| McBride: | I promise you, if there was any way for me not to be here, I wouldn't. I'm here because I love you and I love Ray. If you think anything different, |
| Julie: | I just wish there had been another woman.... |
| McBride: | It doesn't matter. There will be plenty of time for that, Julie. It had to happen sometime. And I'm telling you is that this could be so much worse. |
| Julie: | Why. |
| McBride: | There are folks, men and women who ambush each other, I mean in big ways. |

. . .

| | |
|---|---|
| McBride: | The point I'm making to you is that this is not conducive and that this could be a lot harder and the reason, I'm just telling you, I just want to talk to you. This isn't gonna end and I will not, this is not an ambush on my part, I'm here because I love you, I didn't want to be here. |
| Julie: | I have been ambushed, you may not felt like you don't [sic] it but I have been ambushed. |
| McBride: | Had you rather that I had not been here? |
| Julie: | I wish that I had somebody, a woman. |

. . .

| | |
|---|---|
| McBride: | I know that. (UI) I can't break a confidence. When Ray called me I had no choice. |

. . .

| | |
|---|---|
| McBride: | Julie, (UI) Ray, come on back, (UI) |
| Julie: | Get the ---- out of here. |
| McBride: | I couldn't break . . . |
| Julie: | I am by myself. Do you understand that? |
| McBride: | Yeah, tell me about it, tell me about it. Do you want to match stories? |
| Julie: | No, but I didn't get in the middle of you and Molly either. |
| McBride: | You're also not our priest. |

. . .

| | |
|---|---|
| McBride: | Julie, I had no right to call anybody, that would have broken a confidence. I can't legally do that. I know it would have broken a confidence for me to have called somebody. You understand that? |
| Julie: | So what, so what, so what, so what? |

. . .

| | |
|---|---|
| McBride: | You know what I think. (UI) It's gonna matter, it's gonna matter a lot, everything matters. Trust me. I'm here cause I'm your friend and Ray's friend. I do not advise (UI), I'm a priest, I'm not a lawyer. |

. . .

McBride:        I'm gonna leave (UI). Can we talk later?
Julie:             I don't know.
McBride:        You don't want to? (UI) That's the only thing I want me and you to do.
. . .
[Ray re-enters the room and McBride leaves soon thereafter.]

After leaving the Mabus home, McBride went to one of Julie's friends and told her about the confrontation. McBride also telephoned a mutual friend living in California and told her about the confrontation.

¶27. Whether a fiduciary duty exists is ordinarily a question of fact. *Lowery*, 592 So.2d at 85 (citing *S. Mortg. Co. v. O'Dom*, 699 F. Supp. 1227, 1231 (S.D. Miss. 1988). The Ohio appellate court found a priest liable for divulging the confidence of someone with whom the priest was in a fiduciary relationship. *See Alexander v. Culp*, 705 N.E.2d 378 (Ohio Ct. App. 1997) (after a woman sought counseling from minister for marital problems, the minister told her husband; court found that woman had a claim for breach of confidentiality). A federal district court in Texas has held that a question of whether there was a fiduciary relationship between a minister and parishioners was a question of fact to be determined by a jury. *Sanders v. Casa View Baptist Church*, 898 F. Supp. 1169, 1176 (N.D. Tex. 1996), *aff'd,* 134 F.3d 331 (5th Cir. 1998).

¶28. For the foregoing reasons, we affirm the trial court's finding that Julie's claim for breach of fiduciary duty is not prohibited by the First Amendment, but that a priest may not be held to be in a fiduciary relationship merely based upon his status as a priest. Additionally, when reviewing the transcript of the meeting as well as the entire record, there is equally no doubt that Julie has failed to prove the existence of a fiduciary relationship between McBride and her. Here are but portions of the trial court's memorandum opinion on the summary judgment issue:

> Julie Mabus has not brought any evidence to this Court's attention, nor even alleged in her amended complaint, that she was a dependent person or reposed any trust or confidence in defendant McBride in the course of her confession to adultery.

> \*\*\*\*\*\*\*\*\*\*\*\*\*\*
>
> [Julie] has completely failed to call to this Court's attention any evidence that would rebut that assertion [by Ray that neither he nor McBride informed Julie that McBride was present at the meeting as a marriage counselor], and the transcript of the subject meeting totally belies her allegation that she was requested by her husband "to attend a marital counseling session with her priest."
>
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*
>
> There is no evidence that Julie Mabus was placing a special trust or confidence in Jerry McBride, nor that she was dependent upon him in any way. The evidence conclusively establishes the contrary.
>
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*
>
> Nothing, whatsoever, approaching any reasonable concept of marital counseling was discussed.
>
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*
>
> The Court is of the opinion, however, that [Julie's] words therein leave nothing at all to interpretation or imagination.

The trial judge's finding that the record before him revealed, inter alia, beyond a reasonable doubt that Julie was "unable to prove any facts at trial to support her claim of a fiduciary relationship" was eminently correct.

¶29.    Under the theory of vicarious liability, the Church and Diocese may only be held liable for the actions of their employee taken within the course and scope of his employment.  Since we find that McBride cannot be held liable under Julie's claim of a fiduciary relationship, the Church and/or the Diocese likewise cannot be held liable.  Julie has shown no facts to prove that the Church or Diocese authorized or  ratified McBride's actions in this case.

### B.    Fraudulent Concealment.

¶30.    The trial court denied summary judgment as to the fraudulent concealment claim against McBride, but dismissed the claim against the Church and Diocese.  In arguing that the trial court erred, McBride relies on several arguments: that he did not have a duty to inform Julie that Ray was taping the conversation because it is not illegal or tortious to tape a conversation; under a section entitled "Denial, Concession, and

19

Estoppel", that Julie relied on a fiduciary relationship to establish a duty and conceded that if McBride was a neighbor next door, she would not have a claim and that she made a strategic decision to plead and allege the silence of McBride and not an affirmative act;[8] that the trial court failed to follow Miss. R. Civ. P. 56 by permitting Julie to file an affidavit subsequent to the hearing;[9] and that the trial court made unsupported factual and legal inferences concerning the outcome of the Mabus child custody matter thereby impeaching the chancellor's decision in that case.

¶31. The defendants relied on two of this Court's cases to argue that it is not tortious for a person to secretly record a conversation in which the person is participating. *L.S. v. Miss. Bar*, 649 So.2d 810 (Miss. 1994); *Attorney M. v. Miss. Bar*, 621 So.2d 220 (Miss. 1992). Both of those cases were before this Court on questions of whether attorneys violated the rules of professional conduct. Here, the trial court found:

> The actual ruling in the *Attorney M.* case was that there was nothing remiss in surreptitious tape recording "when the act, 'considered within the context of the circumstances then existing,' does not rise to the level if dishonest, fraud, deceit, or misrepresentation.'" [*Attorney M.,* 621 So.2d at 223 (*quoting Netterville v. Mississippi State Bar*, 397 So.2d 878, 883 (Miss. 1981).] The converse, of course, is that such recordings are to be condemned when they *do* rise to the level of dishonesty, fraud, deceit, or misrepresentation. Thus, if cases addressing the propriety *vel non* of attorneys secretly tape recording conversations are applicable to non-lawyers such as defendant McBride, his motion for summary judgment must fail.

---

[8]While McBride also argues in his brief that the trial court expanded Julie's allegations of fraudulent concealment to an action for fraud and conspiracy, we find that this sub-issue is without merit. The allegations contained in the First Amended Complaint were sufficient to place McBride and the other defendants on notice that Julie was alleging that it was McBride's affirmative actions and representations, and not just silence, that caused Julie's alleged injuries. Furthermore, in each instance where Julie was relying on McBride's silence, she was also arguing that a fiduciary relationship existed. In the absence of a fiduciary relationship, an affirmative act of concealment is necessary.

[9]Not only is this issue procedurally barred, it is without merit.

The trial court further stated that McBride was not just a "wallflower" and that he participated "in a charade for [Julie] to believe that the conversation to follow would be just between the two of them"[10] and that McBride "did the great majority of the wheedling on behalf of Ray Mabus, doggedly cajoling Julie Mabus to talk about her affair, first to him (McBride) and then to Ray." The trial court then addressed the issue of fraud.

¶32.    Fraud may be manifested in multiple ways:

In order to establish fraud, the plaintiff must prove (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) his reliance on its truth, (8) his right to rely thereon, and (9) his consequent and proximate injury. *Hamilton v. McGill*, 352 So.2d 825 (Miss.1977); *McMahon v. McMahon*, 247 Miss. 822, 157 So.2d 494 (1963); *Anderson Dunham, Inc. v. Aiken*, 241 Miss. 756, 133 So.2d 527 (1961). Furthermore, under Mississippi law, these elements must be shown by clear and convincing evidence. *Parker v. Howarth*, 340 So.2d 434 (Miss.1976); *Crawford v. Smith Bros. Lumber Co., Inc.*, 274 So.2d 675 (Miss.1973).

*Franklin v. Lovitt Equip. Co.*, 420 So.2d 1370, 1373 (Miss. 1982). In a contractual scenario, in order for there to be liability for nondisclosure, silence must relate to a material fact or matter known to the party and as to which it is his legal duty to communicate to the other contracting party. *Guastella v. Wardell*, 198 So.2d 227, 230 (Miss. 1967). An affirmative act of concealment is necessary. *Rankin v. Brokman*, 502 So.2d 644, 646 (Miss. 1987); *Van Zandt v. Van Zandt*, 227 Miss. 528, 86 So.2d 466, 470 (1956). Although this was not a contractual setting, the same legal analysis is appropriate.

¶33.    Clearly, McBride had prior knowledge that Ray was going to tape the conversation on the advice of Ray's attorney. Julie asserted in her affidavit that had she known that she was being taped, she would have responded differently. Although Ray's affidavit reveals that Julie did not divulge any new or

_____

[10]The trial court then quoted much of the transcript to which we have already referred.

confidential information, that is immaterial as to Julie's claim. Certainly, Ray's knowledge is significantly different than having Julie's purported admission of the affair on tape. At all times, McBride was an active participant in obtaining Julie's statements relating to the affair.

¶34. The trial court found that: "It would not be an unfair inference from the record in this case that [Ray] solicited and secured the assistance of Jerry McBride in securing that recorded acknowledgment, which was tantamount to a surrender of her custodial rights in her children." It is this last part of the sentence to which McBride takes issue and argues that the trial court is impeaching the chancellor's decision. However, McBride relies on no legal authority, Therefore, this Court need not consider this issue. *Grey v. Grey*, 638 So.2d 488, 491 (Miss. 1994) (collecting authorities).

¶35. When considering the record before us and the applicable law, we thus find that the trial court's denial of summary judgment as to the fraudulent concealment claim against McBride was proper. As to the dismissal of the Church and Diocese, Julie argues that while the order provided ten pages of justification as to McBride, there was virtually no discussion as to the Church and Diocese. Therefore, Julies asserts that she must assume that the trial court made a finding that McBride acted outside of his authority as a priest despite McBride's affidavit stating that he was present at the Mabus home in his capacity as an Episcopalian priest even though McBride stated in his affidavit that "[m]y purpose for being present in the Mabus residence on the day in question was simply to be supportive of members of the church during a time of family crisis." Julie relies on *Fruchter v. Lynch Oil Co.*, 522 So.2d 195 (Miss. 1988), in her attempt to hold the church and diocese liable.

¶36. There is no vicarious liability where an agent acted with personal or malicious motive, unless the principal authorized or ratified the acts. *McClinton v. Delta Pride Catfish, Inc.*, 792 So.2d at 976 (citing *Forrest County Cooperative Ass'n v. McCafferty*, 176 So.2d at 290). Julie has shown no

facts to prove that the Church or Diocese authorized or ratified McBride's actions in this case. Therefore, we find that the grant of summary judgment on the fraudulent concealment claim against the Church and Diocese was proper.

### C. The Remaining Negligence claims.

¶37. Julie also asserted claims for negligent misrepresentation, negligent infliction of emotional distress, clergy malpractice, and negligent supervision and retention. The trial court granted summary judgment on each of these claims as to all defendants. Julie concedes that clergy malpractice claims have been rejected across the country; however, she argues that courts have recognized the remaining negligence claims without violating the Free Exercise Clause or the Establishment Clause.

¶38. Illinois has "soundly rejected" a cause of action for clergy malpractice and, in doing so, analyzed other state court cases uniformly rejecting a cause of action for clergy malpractice:

> The following state supreme courts have held that there is no cause of action for clergy malpractice: **Handley v. Richards**, 518 So.2d 682 (Ala.1987); **Moses v. Diocese**, 863 P.2d 310 (Colo.1993), *cert. denied*, 511 U.S. 1137, 114 S.Ct. 2153, 128 L.Ed.2d 880 (1994); **Destefano v. Grabrian**, 763 P.2d 275 (Colo.1988); **Byrd v. Faber**, 57 Ohio St.3d 56, 565 N.E.2d 584 (1991); **Strock v. Pressnell**, 38 Ohio St.3d 207, 527 N.E.2d 1235 (1988); **Schieffer v. Catholic Archdiocese**, 244 Neb. 715, 508 N.W.2d 907 (1993). Two other state supreme courts have defeated clergy malpractice actions on other grounds without determining the propriety of causes of action for clergy malpractice: **Doe v. Roman Catholic Diocese**, 862 S.W.2d 338 (Mo.1993), and **Bladen v. First Presbyterian Church**, 857 P.2d 789 (Okla.1993). Other state courts refusing to recognize clergy malpractice claims include **Nally v. Grace Community Church of the Valley**, 240 Cal.Rptr. 215 (Cal.App.1987), *rev'd on other grounds*, 47 Cal.3d 278, 253 Cal.Rptr. 97, 763 P.2d 948 (1988), *cert. denied*, 490 U.S. 1007, 109 S.Ct. 1644, 104 L.Ed.2d 159 (1989); **Fontaine v. Roman Catholic Church**, 625 So.2d 548 (La.Ct.App.1993); **Jones by Jones v. Trane**, 153 Misc.2d 822, 591 N.Y.S.2d 927 (Sup.Ct.1992); and **E.J.M. v. Archdiocese**, 424 Pa.Super. 449, 622 A.2d 1388 (1993).

**Dausch v. Rykse**, 52 F.3d 1425, 1432 n.4 (7th Cir. 1994) (Ripple, J., concurring in part & dissenting in part). "This unanimity is based on the difficulty that would be encountered in evaluating such a claim

23

without entangling the civil courts in extensive investigation and evaluation of religious tenets." *Id.* (relying upon *Thomas v. Review Bd.*, 450 U.S. 707, 716, 101 S.Ct. 1425, 1431, 67 L.Ed.2d 624 (1981) and *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. at 724-25, 96 S.Ct. at 2387-88).

¶39. The same may be said for all of the remaining negligence claims. "To prevail on a negligence claim, the plaintiff must establish by a preponderance of the evidence each of the elements of negligence: duty, breach, causation and injury." *Miss. Dep't of Transp. v. Cargile*, 847 So.2d 258, 262 ¶ 11 (Miss. 2003) (citing *Leflore County v. Givens*, 754 So.2d 1223, 1230 (Miss. 2000) (citing *Lovett v. Bradford*, 676 So.2d 893, 896 (Miss. 1996)). It is in the establishment of the duty of McBride, the Church, and the Diocese that would excessively entangle this Court into the investigation and evaluation of religious tenets. Therefore, we find that the trial judge was eminently correct in granting summary judgment dismissing the remaining claims against all defendants.

### III. Recusal.

¶40. The final issue on appeal is whether the trial judge erred in denying Julie's recusal motion. In the August 21, 2002, "Memorandum Opinion Regarding Defendants' Motion For Partial Summary Judgment on Plaintiff's Breach-of-Fiduciary-Duty Claims," the judge wrote:

> The Mabus children, two young girls, twelve and ten years of age, deserve some measure of privacy and this Court is not willing to even incidentally sacrifice that peace of mind upon the altar of their mother's vain pursuit of lucre.

Julie argues that this statement caused her to question whether the trial judge was influenced by matters outside the pleadings inasmuch as he made unsupported assumptions of the children's needs and desires without facts or testimony, and expressed strong negative opinions about Julie and her motivation to proceed with this lawsuit.

24

¶41.    This Court applies the manifest error standard when reviewing a judge's refusal to recuse himself. *Bredemeier v. Jackson*, 689 So.2d 770, 774 (Miss. 1997) (citing *Davis v. Neshoba County Gen. Hosp.*, 611 So.2d 904, 905 (Miss. 1992)). Pursuant to the Code of Judicial Conduct, a judge must disqualify when that judge's "impartiality might be questioned by a reasonable person knowing all the circumstances ... including but not limited to instances where: (a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." Code of Judicial Conduct, Canon 3(E)(1). The test for recusal has been stated as follows: "[W]ould a reasonable person, knowing all the circumstances, harbor doubts about the judge's impartiality?" *In re Conservatorship of Bardwell*, 849 So.2d 1240, 1247 (Miss. 2003);*Bredemeier*, 689 So.2d at 774 (citing *Frierson v. State*, 606 So.2d 604, 606 (Miss. 1992); *Rutland v. Pridgen*, 493 So.2d 952, 954 (Miss. 1986)). This Court presumes a judge to be qualified and unbiased, and that presumption must be overcome by evidence producing a "reasonable doubt" about the validity of the presumption. *Turner v. State*, 573 So.2d 657, 678 (Miss. 1990).

¶42.    We find without doubt that the subject statement contained in the August 21, 2002, Memorandum Opinion is insufficient to overcome the presumption.  Nor has Julie presented any other evidence raising a question of Judge DeLaughter's ability to be impartial in this matter.  Therefore, the trial court did not err in denying the recusal motion.

## CONCLUSION

¶43.    For the reasons herein stated, we unhesitatingly affirm in toto the trial court's judgments and remand this case to the Circuit Court of Hinds County, First Judicial District, for appropriate disposition of Julie's claim of fraudulent concealment against Jerry McBride, individually.

¶44.　NO. 2003-CA-00123-SCT: AFFIRMED.　NO. 2003-IA-00439-SCT: AFFIRMED AND REMANDED.

　　SMITH, C.J., WALLER, P.J., EASLEY AND RANDOLPH, JJ., CONCUR. DICKINSON, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY COBB, P.J.　DIAZ AND GRAVES, JJ., NOT PARTICIPATING.

**DICKINSON, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART**:

¶45.　Writing for the majority, Justice Carlson has, in my opinion, fully and appropriately addressed almost every issue in this case.　However, because I believe summary judgment should have been granted on the fraudulent concealment claim against Jerry McBride, I must respectfully dissent.

¶46.　Julie contends she was "ambushed" by her husband, Ray Mabus, and her priest, Jerry McBride. She was.　Nevertheless, an "ambush" is not synonymous with fraudulent concealment.　I am persuaded that McBride was entitled to summary judgment for several reasons.　First, Julie falls far short of demonstrating triable issues on the elements of fraudulent concealment.　Second, the majority incorrectly claims that the transcript reflects Julie's admissions of adultery, which was "tantamount to a surrender of her custodial rights."　Finally, it seems to me contrary to public policy for Julie to claim as damages an award of custody in the best interest of her children.

*Fraudulent concealment*

¶47.　The majority correctly cites *Guastella v. Wardell*, 198 So. 2d 227 (Miss. 1967), for the proposition that, "in order for there to be liability for nondisclosure, silence must relate to a material fact or matter known to the party and to which it is his legal duty to communicate to the other contracting party."

Having correctly recited the principle of law, however, the majority provides no explanation of McBride's "legal duty" to communicate to Julie that Ray was secretly recording the meeting. While I do not approve or condone McBride's behavior, I find no authority which suggests he had a legal duty to inform Julie of Ray's secret recording.

¶48.    The majority also relies upon *Rankin v. Brokman*, 502 So. 2d 644 (Miss. 1987). I agree that *Rankin* is on point, although I find a more complete recitation from that case is helpful. In *Rankin* this Court held that, in some cases of fraud, there may be no evidence of a misrepresentation. However, "this does not end the inquiry." The Court stated:

> The omission or concealment of material facts can constitute a misrepresentation. But in such a case, this Court has held that:
>
> > [I]n order to recover damages for fraudulent concealment [the plaintiff] must demonstrate [that the defendant] took some action, affirmative in nature, which was designed or intended to prevent and which did prevent the discovery of the facts giving rise to the fraud claim. *Davidson v. Rogers*, 431 So. 2d 483, 485 (Miss. 1983).

*Rankin*, 502 So. 2d at 646.

¶49.    Neither the majority nor Julie has suggested any action by McBride (beyond his silence) to conceal the tape recording. The majority incorrectly substitutes McBride's participation in the conversation for the required active participation in the concealment of the recording. It is not the conversation that Julie alleges was concealed from her, but rather the recording of it. Absent some active participation by McBride in secretly recording the conversation, or some other legal duty to disclose to Julie that Ray was secretly recording the conversation, there can be no liability for fraudulent concealment.

*Admission of adultery*

27

¶50.    The majority refers to Julie's "purported admission of the affair on tape," and her "statements relating to the affair," and the "recorded acknowledgment" of the affair. Indeed, the majority simply assumes that, when confronted by Ray (in the presence of McBride), Julie admitted to having an affair. It is this alleged admission which supposedly led to Julie's loss of custody and, thus, her claim of damages. However, the transcript of the conversation between Julie, Ray and McBride reveals no such admission. Thus, the very basis of Julie's claim of damages does not exist.

*Public policy*

¶51.    Finally, even if the transcript reflected Julie's admission to having an affair (which it doesn't) and even if the assumed admission of an affair had been considered by the chancellor in awarding custody of the children to Ray, it seems to me public policy would prevent Julie from claiming the loss of custody as "damages." Presumably, the chancellor in Julie's divorce proceeding awarded custody of the children based upon the best interests of the children. If the chancellor's decision was based, in part, on the transcript, we must assume that the decision would be different only if the transcript was unavailable, and the content of the conversation was misrepresented to the chancellor. Surely, Julie does not assert that she was damaged by being deprived of an opportunity to misrepresent the content of the conversation to the court.

¶52.    In summary, I believe McBride had three appropriate, moral, honorable options. He could have insisted that Ray refrain from recording the meeting; he could have informed Julie of it; or he could have refused to attend. However, my beliefs of what is appropriate, moral or honorable cannot impose legal responsibilities upon McBride, and I refuse to do so here. The consequences of his actions must be, I think, determined by a higher authority. Accordingly, I dissent to the extent that the majority affirms the

denial of summary judgment and remands for a trial on the issue of fraudulent concealment by McBride.

In all other respects, I concur in the majority's opinion and judgment.

**COBB, P.J., JOINS THIS OPINION.**